**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012-1927
(602) 271-4250
(602) 271-4300 FAX
S. CARY FORRESTER (006342)
SCF@FORRESTERANDWORTH.COM

COUNSEL FOR DEBTORS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **In re:**<br><br>**STAR BUFFET, INC.,**<br><br>              **Debtor.** | **Chapter 11**<br><br>**Jointly Administered**<br><br>**Case Nos.: 2:11-bk-27518 and**<br>              **2:11-bk-27713** |
| **In re:**<br><br>**SUMMIT FAMILY RESTAURANTS, INC.,**<br><br>              **Debtor.** | **MOTION FOR APPROVAL OF ASSUMPTION OF LEASE WITH J.C.R.S. SHOPPING CENTER, INC.** |
| THIS FILING APPLIES TO:<br><br>   ___   BOTH DEBTORS<br><br>   ___   STAR BUFFET, INC.<br><br>   _X_   SUMMIT FAMILY<br>            RESTAURANTS, INC. | |

Pursuant to 11 U.S.C. § 365, Rule 6006, Rules of Bankruptcy Procedure, and Rule 6006-1, Local Rules of Bankruptcy Procedure, debtor Summit Family Restaurants, Inc. ("**Summit**"), hereby moves the court for the entry of approving the assumption of its lease ( the "**Lease**") with J.C.R.S. Shopping Center, Inc. ("**JCRS**") for the restaurant property located at 6715 W. Colfax, Denver,

Colorado, 80214. A copy of the Lease is attached as Exhibit "A". The Lease runs through October 31, 2013. All monthly payments and other obligations owing under the Lease are current.[1] This motion is more fully set forth and supported in the accompanying Memorandum of Points and Authorities and the Declaration of Ronald Dowdy, Summit's Secretary/Treasurer, attached as Exhibit "B".

## MEMORANDUM OF POINTS AND AUTHORITIES

**A.     Procedural Background**.

1.     Star Buffet, Inc. ("**SBI**") filed its voluntary petition under Chapter 11 of the Bankruptcy Code on September 28, 2011.

2.     Summit filed its voluntary petition under Chapter 11 of the Bankruptcy Code on September 29, 2011.

3.     On October 14, 2011 the court entered its order allowing the two bankruptcy cases to be jointly administered.

4.     Summit is a wholly-owned subsidiary of SBI, which is a publicly traded restaurant holding company. Summit owns or leases nine restaurants.

5.     A joint official committee of unsecured creditors was appointed on November 1, 2011, but has not retained counsel.

**B.     The Lease.**

6.     On November 1, 1972, Casa Bonita of Tulsa, Inc. ("**CBTI**") and JCRS entered into a lease of the real property located 6715 W. Colfax, Denver,

---

[1]   Summit now makes payments to JCRS Investments, LLC, and does not know whether the Lease has been assigned to it. Accordingly, copies of this Motion and the notice of hearing will also be sent to JCRS Investments, LLC. To the extent that the Lease has been assigned to it, all references in this Motion to the landlord or JCRS should be deemed to refer to JCRS Investments, LLC.

Colorado, 80214 (the "**Casa Bonita Restaurant**"). Summit is the successor-in-interest to CBTI. The Lease has been extended three times and now expires on October 31, 2013. (Exhibit "B", ¶ 7). The minimum monthly lease payments are approximately $2,916.67. (Exhibit "B", ¶ 8). Summit pays additional rent equal to the difference between 1.5% of gross sales and the amount of the minimum rent. (Exhibit "B", ¶ 8).

7.     The Casa Bonita Restaurant generated more than $1.4 million in operating profit in FY 2011, and is projected to generate more than $1.3 million in operating profit in FY 2012. (Exhibit "B", ¶ 10). It is the most profitable restaurant in the SBI family of companies. (Exhibit "B", ¶ 10).

**C.     Legal Analysis.**

8.     11 U.S.C. § 365 provides, in pertinent part, as follows:

(a)     Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the [debtor-in-possession], subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1)     If there has been a default in an executory contract or unexpired lease of the debtor, the [debtor-in-possession] may not assume such contract or lease unless, at the time of assumption of such contract or lease, the [debtor-in-possession] —

(A)     cures, or provides adequate insurance that the [debtor-in-possession] will promptly cure, such default…;

(B)     compensates, or provides adequate assurance that the [debtor-in-possession] will promptly compensate, a party other than the debtor to such

contract or lease for any actual pecuniary loss to such party resulting from such default; and

(C)      provides adequate assurance of future performance under such contract or lease.

9.      The standard for approval of assumption of an unexpired lease is the "business judgment" standard, which requires the debtor to make a sufficient showing that assumption would be advantageous to the estate and that it will be able to perform. *In re S. Cal. Sound Sys., Inc.*, 69 B.R. 893, 896 (Bankr. S.D. Cal. 1987); *In re Circle K Corp.*, 1991 WL 349900, *10 (Bankr. D. Ariz. 1991) (citing *Group of institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 318 U.S. 523, 551 (1943)). If the debtor makes such a showing, it will normally be allowed to assume the contract. *In re Del Grosso*, 115 B.R. 138 (B. N. D. Ill. 1990). In evaluating an assumption motion, "the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the bankruptcy estate." *In re Pomona Valley Medical Group, Inc.*, 476 F.3d 665, 670 (9th Cir. 2007).

10.      By assuming the Lease, Summit is seeking to preserve its most valuable asset and to protect the jobs of the restaurant employees. (Exhibit "B", ¶ 11). Its ability to perform in the future is evidenced by the cash flow generated from the restaurant, the lack of any existing defaults, and the profitability of Summit and its parent, SBI, going forward. (Exhibit "B", ¶¶ 8, 10, 12-16). Summit generated net operating income of $1,522,561 in FY 2011, and will generate net operating income of $2,017,743 in FY 2012 and an additional $2,337,958 in FY 2012. (Exhibit "B", ¶ 13). Summit's parent company, SBI, generated net operating income of $4,383,848 in FY 2011, and will generate net operating income of

$3,123,848 in FY 2012 and an additional $3,653,687 in FY 2012. (Exhibit "B", ¶ 14). In each case, the net operating income will continue to increase over time. (Exhibit "B", ¶ 14).

11.     Summit's ability to perform is also demonstrated by the fact that it has remained current on its rent payments, even during the recent recession. (Exhibit "B", ¶ 15). Also, unlike many Chapter 11 cases, most if not all of the cost saving measures required to cope with the downturn in the economy have already been completed, and Summit and SBI have already returned to profitability. (Exhibit "B", ¶ 16). For example, since the recession began in 2008, management staff has been reduced from 13 employees to 6, overall administrative expenses have been reduced from approximately $3.8 million to approximately $1.6 million, and 35 restaurants have been closed or leased to third parties. (Exhibit "B", ¶ 16).

**D.     Conclusion**.

For all the reasons set forth above, Summit requests that the court approve the assumption of the Lease.

Dated January 25, 2012.


**FORRESTER & WORTH, PLLC**


/s/ SCF 006342
S. Cary Forrester
Counsel for Debtors

Copy emailed and/or mailed
January 25, 2012 to:

Office of U.S. Trustee
230 North First Avenue, Suite 204
Phoenix, Arizona 85003
Ustpregion14.px.ecf@usdoj.gov

Craig Solomon Ganz, Esq.
Gallagher & Kennedy, PA
2575 East Camelback Road
Phoenix, Arizona 85016
craig.ganz@gknet.com
maricella.nunez@gknet.com
jane.hernandez@gknet.com
*Attorneys for Spirit Master Funding*

Simon Property Group, Inc.
Attn: Ronald M. Tucker, Esq.
225 West Washington Street
Indianapolis, Indiana 43204
rtucker@simon.com
rwoodruff@simon.com
cmartin@cimon.com
psummers@simon.com
antimm@simon.com

Wells Fargo Bank, N.A.
c/o Michele Sabo Assayag, Esq.
Jaime K. Shean, Esq.
Assayag Mauss
2915 Redhill Avenue, Suite 200
Costa Mesa, California 92626
efilings@amlegalgroup.com
jaimes@amlegalgroup.com

Jeffrey C. Hampton, Esq.
Melissa W. Rand, Esq.
Saul Ewing LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
jhampton@saul.com
mrand@saul.com
*Attorneys for U.S. Foodservice, Inc.*

Sarah D. Moyed, Esq.
Bankruptcy Counsel
United States Securities and
Exchange Commission
5670 Wilshire Boulevard, 11th Floor
Los Angeles, California 90036
moyeds@sec.gov

| | | |
|---|---|---|
| 1 | Thomas E. Littler, Esq. | Thomas H. Allen, Esq. |
| 2 | Robert C. Warnicke, Esq. | Michael A. Jones, Esq. |
| | Gordon Silver | Allen, Sala & Bayne, PLC |
| 3 | One E. Washington Street, Suite 400 | 1850 N. Central Avenue, Suite 1150 |
| 4 | Phoenix, Arizona 85004 | Phoenix, AZ 85004 |
| | tlittler@gordonsilver.com | tallen@asbazlaw.com |
| 5 | rwarnicke@gordonsilver.com | mjones@asbazlaw.com |
| 6 | phxbknotices@gordonsilver.com | rnieto@asbazlaw.com |
| | *Attorneys for JB's Family Restaurant* | asbecf@asbazlaw.com |
| 7 | | mhinshaw@asbazlaw.com |
| 8 | | atty_asb@trustesolutions.com |
| 9 | | cmcdonald@asbazlaw.com |
| | | *Attorneys for Tinsley Hospitality* |
| 10 | | *Group, LLC; Edward R. Tinsley, III;* |
| 11 | | *Flying W. Diamond Ranch, Inc.; K-* |
| | | *Bob's U.S.A., Inc. and K-Bob's Capital* |
| 12 | | *Resource Group, LTD* |
| 13 | | |
| 14 | Joseph Wm. Kruchek, Esq. | John G. Sinodis, Esq. |
| | Kelley E. Braden, Esq. | Bryan W. Goodman, Esq. |
| 15 | Kutak Rock, LLP | Jennings, Haug & Cunningham, LLP |
| 16 | 8601 N. Scottsdale Road, Suite 300 | 2800 North Central Avenue |
| 17 | Scottsdale, Arizona 85253-2742 | Suite 1800 |
| | joe.kruchek@kutakrock.com | Phoenix, Arizona 85004-1049 |
| 18 | kelley.braden@kutakrock.com | jgs@jhc-law.com |
| 19 | Rebekah.poston@kutakrock.com | bwg@jhc-law.com |
| 20 | *Attorneys for Wells Fargo Bank, N.A.* | ab@jhc-law.com |
| | | *Attorneys for Oshunola, LLC and* |
| 21 | | *Nareke, LLC* |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

| | |
|---|---|
| 1 | Christopher H. Bayley | John M. Koneck, Esq. |
| 2 | Snell & Wilmer, LLP | Fredrikson & Byron, P.A. |

Christopher H. Bayley
Snell & Wilmer, LLP
One Arizona Center
400 E. Van Buren
Phoenix, Arizona 85004-2202
CBayley@swlaw.com
*Attorneys for Chris Bakwin*

John M. Koneck, Esq.
Fredrikson & Byron, P.A.
Suite 4000
200 South Sixth Street
Minneapolis MN 55402-1425
jkoneck@fredlaw.com
*Attorneys for AEI Fund Management*

Steven C. Mahaffy, Esq.
Mahaffy Law Firm, P.C.
P.O. Box 12959
Chandler, Arizona 85248
steve@mahaffylaw.com
*Attorneys for Michael D. Naumes and Susan F. Naumes*

Frederick B. King, LLC
Attorneys at Law
1200 N. 18th Street, Suite AA
Monroe, LA 71201
fbking10@comcast.net
*Attorneys for K & A Brasher, LLC*

K & A Brasher LLC
c/o Fred King
1200 N. 18th Street, #AA
Monroe, LA 71201

Spirit Master Funding LLC
Attn: Sean Hufford
14631 N. Scottsdale Road #200
Scottsdale, AZ 85254

Tinsley Hospitality Group LLC:
K-BOB'S USA Inc.,
Flying W Diamond Ranch Inc.,
K-BOB'S Capital Resource Group
Attn: Ed Tinsley
141 E. Palace Avenue
Santa Fe, NM 87501

Dean M. Dinner, Esq.
Nussbaum Gillis & Dinner, P.C.
14500 N. Northsight Blvd., Suite 116
Scottsdale, Arizona 85260
ddinner@ngdlaw.com
*Attorneys for Platinum Bank*

JCRS Investments, LLC                    J.C.R.S. Shopping Center, Inc.
c/o Lori A. Sakowicz                     c/o Lori A. Sakowicz
1800 Larimer Street                      JCRS Investments, LLC
Suite 1700                               1800 Larimer Street
Denver, CO 80202                         Suite 1700
                                         Denver, CO 80202


JCRS Investments, LLC                    J.C.R.S. Shopping Center, Inc.
c/o Newmark Knight Frank                 c/o Newmark Knight Frank
Frederick Ross                           Frederick Ross
PO Box 8225                              PO Box 8225
Denver, CO  80201                        Denver, CO  80201


J.C.R.S. Shopping Center, Inc.
6647 W. Colfax Ave.
Lakewood, CO 80214



/s/ Carrie Lawrence
Carrie Lawrence

# EXHIBIT "A"

# L E A S E

THIS LEASE, dated **NOVEMBER 1** _____, 1972, between
J.C.R.S. SHOPPING CENTER, INC. ("Landlord") and CASA BONITA OF TULSA,
INC. ("Tenant"),

WITNESSETH that Landlord and Tenant hereby agree as follows:

1. **EXHIBITS.** The following drawings are attached hereto as
exhibits and made a part of this Lease:

Exhibit A: General site plan of a commercial shopping center,
known as "J.C.R.S. Shopping Center" located at the corner of West
Colfax Avenue and Pierce Street in Spivak, Jefferson County, Colorado.
Said site plan shows, among other things, the exterior boundaries of
said shopping center and the principal improvements which comprise
said shopping center and a site plan of the Building in which the
Premises are to be located, showing the portion of the Building com-
prising the Premises.

~~Exhibit B: Option to Purchase.~~

2. **DEFINITIONS.** Unless the context clearly indicates otherwise,
the following words and phrases shall have the following meanings:

A. "Lease" means this instrument as it may hereafter be modified,
amended or supplemented.

B. "Lease Year" means a period during the term of this Lease
commencing on the 1st day of January in any year and ending at midnight
on the next succeeding December 31st; provided, however, that the first
Lease Year shall commence at the start of the term of this Lease and
shall end at midnight on the next succeeding December 31st and the last
Lease Year shall end at the end of the term of this Lease.

C. "Building" means the building in which the Premises are to be
located, together with any additions thereto (including additional
stories and enlargement of existing stories) which Landlord or Tenant
may make from time to time, and the land underlying the Building.

D. "Premises" means the portion of the Building leased to Tenant
hereunder.

E. "Center" means the shopping center owned by Landlord, as
shown on Exhibit A.

F. "Parking Areas" means the common areas in the Center used
for the parking of motor vehicles by tenants of the Center and their
customers, employees and invitees, and incidental roadways, walkways
and landscaping therein.

G. "Gross Sales" means the entire gross income of Tenant from
any operation in, at, upon or from the Premises, including, without
limitation, the entire price, whether wholly or partly for cash or
on credit, or otherwise, of all food, goods and merchandise sold or
delivered, and all charges for services sold or performed, in, at,
upon or from any part of the Premises by Tenant or by means of any
mechanical or vending device. The following may be excluded or
deducted (if previously included) from gross income in computing
Gross Sales: (i) net cash or credit refunds, not in excess of the
purchase price, in fact made upon sales from the Premises, but only
if such purchase price was included in Gross Sales; (ii) sales of
fixtures after their substantial use by Tenant in the conduct of

county, state or Federal sales, luxury or excise taxes on sales from the Premises where such taxes are both added to (or absorbed in) the selling price and paid to the taxing authorities by Tenant (but not by any vendor of Tenant).

H.   "Minimum Rent" means the minimum or base rent payable by Tenant in respect of each month during the term hereof.

I.   "Percentage Rent" means the additional rent payable by Tenant in respect of each Lease Year equal to the amount (if any) by which the agreed percentage of Gross Sales realized from the Premises during such Lease Year exceeds the Minimum Rent paid in respect of such Lease Year.

J.   "Leasehold Improvements" means all structural improvements, additions, alterations, fixtures and coverings installed in the Premise at Tenant's expense (and not in replacement of similar work or material originally installed by Landlord) and attached or affixed to the floors walls, ceilings or other parts of the Building and all non-structural interior and exterior decorations and improvements as well as all resta rant equipment, furniture, furnishings and movable fixtures, including counters, shelving, showcases, mirrors and similar items, installed in the Premises at Tenant's expense, including Tenant's signs. even when, but for this provision, such improvements would be considered as becomi part of the building, all of which improvements shall be and remain the property of the Tenant and may be removed by the Tenant at the conclusion of the lease if Tenant is not in default, and so long as remova does not damage original structural aspects of the Building as they existed at the time of signing of this lease.  Tenant will not remove c deface exterior decor or structural addition (s) to building.  Tenant shall not remove toilets, plumbing, heating, air conditioning, facilit: or hot water heaters (except boilers).  See also, Paragraph 34 infra.

3.   PREMISES AND TERM.

a)   Landlord hereby leases to Tenant, and Tenant hereby hires from Landlord, the Premises shown as Tracts 3+1C on Exhibit A.  The term of this Lease shall be ten (10) years commencing on the date on which the first installment of Minimum Rent becomes payable hereunder.  The Tenant shall have the option to extend this Lease, upon the same terms, for three (3) successive periods of ten (10) years each, each such option to be exercised in writing by the Tenant not later than sixty (60) days prior to the expiration of the then existing term.  If notice that option to renew is not given by Tenant within 60 days then Landlord must give notice to Tenant that unless Tenant exercises its option to renew within 15 days from receipt of Landlord's notice said option shall be null and void and Tenant shall vacate within 60 days if so requested.  Tenant's option shall remain in effect until notice from Landlord is given as above provided even though primary or subsequent term has expired.  Promptly after commencement of the term, Landlord and Tenant shall execute a memorandum or letter agreement specifying the dates of commencement and termination hereof.

b) Upon the execution of this Lease and there-
after, Tenant shall have the right to occupy the
Premises for the purpose of remodeling, installing
fixtures and doing all other things to prepare the
Premises to be opened for business.

## 4. MINIMUM RENT.

a) Tenant shall pay Landlord the annual sum
of Thirty-Five Thousand Dollars ($35,000.00) as
the Minimum Rent in respect of each year during
the term hereof. The Minimum Rent shall be pay-
able monthly, in advance, on the first day of
each month. The first installment shall be due
and payable when Tenant opens for business or 12
months after execution of this lease whichever
occurs first; provided, tenant for first 12 months
or until it opens for business, whichever occurs
first, shall pay Landlord rental of $1,000.00 per
month. The first month's rental of $1,000.00 shall
be due and payable upon execution of this lease.
In addition the first full month's rental of
$2,916.66 shall be paid in advance upon execution
hereof making a total payable of $3,916.66 upon
signing hereof. The 12th payment each year shall
be $2,916.74 (.08¢ additional is required to make
total yearly payments equal $35,000.00). If the
first installment date is other than the first day
of a month, the Minimum Rent for the month in which
such date falls shall be at a daily rate of one-
thirtieth (1/30th) of the Minimum Rent payable for
the first full month.

b) Landlord warrants that title is insurable
and agrees to pay premium for first $50,000.00 of
title insurance coverage. If title is not insur-
able, Tenant, at its option, may declare this lease
null and void. Monthly rentals shall be returned
to Tenant.

## 5. PERCENTAGE RENT.

a) Tenant shall also pay Landlord, as Percentage
Rent in respect of each Lease Year, the amount (if
any) by which one and one-half percent (1-1/2%)
of Gross Sales realized from the Premises during
such Lease Year exceeds the total amount of Minimum
Rent payable and paid in respect of such Lease Year.
The Percentage Rent shall be computed as of the end
of each Lease Year and shall be payable within sixty
(60) days after the end of each Lease Year.

b) During the first five (5) years of the ini-
tial term of this Lease, all of any overage Rent shall
be placed by Tenant in a separate account and shall
be used to finance landscaping of the Center. Tenant
shall, at it's own expense, plan and supervise said
landscaping. Tenant may as a part of the landscaping
construct a fountain on the outside of the leased

## 6. TENANT'S RECORDS AND STATEMENTS.

a) Tenant shall keep at the Premises, or at such other place as shall be agreed upon between Landlord and Tenant, true and complete records and accounts of all sales and business transacted at the Premises. Tenant shall give Landlord access, during reasonable hours, to such records and accounts.

b) Within forty-five (45) days after the end of each Lease Year, Tenant shall cause a statement of the Gross Sales for such Lease Year to be prepared and certified by an independent certified public accountant and delivered to Landlord.

c) Tenant shall give Landlord unaudited monthly statement of preceding month by 15th day of each month.

7. PLACE OF PAYMENT. Tenant shall make all payments required under this Lease to Landlord at the address specified by Landlord for the receipt of notices hereunder or to such other person or corporation or at such other place as may from time to time be designated by Landlord in writing at least ten (10) days prior to the next ensuing payment date.

8. PERMITTED USES OF PREMISES. The Premises may be used and occupied for the purposes of a restaurant and any other businesses in which the Tenant may be or become engaged, without Landlord's consent so long as it does not interfere with other tenants vested lease rights and original Tenant to remain liable on lease.

## 9. EXCLUSIVE RIGHTS OF TENANT.



a) The parties hereto understand that adequate parking area is vital to the success of Tenant's business operation on the Premises. To this end, those operations such as motion picture theatres, exhibition halls for presentation of dramatic, comic and musical shows or sports events shall not be housed or operated in any building now existing in the entire Center or upon existing parking areas.



b) No other restaurant or cafe other than Denver Drumstick Incorporated shall be permitted to operate in the Center. The Landlord shall insure that its assigns or Tenants or their sub-lessees shall not violate the terms of this paragraph 9 a) and b); provided that this paragraph shall not apply to present vested rights of any tenant under existing leases, and this restriction shall apply only to property described in Exhibit A.

## 10. COMPLIANCE WITH REGULATIONS.

a) Tenant shall at its own expense promptly comply with all present and future Federal, state and local laws, ordinances, orders and regulations, and all requirements of the Board of Fire Underwriters and any other board or organization exercising similar functions, regulating or affecting

the use or occupancy of or otherwise applicable
to the Premises, provided that Tenant shall not
be required to make any structural changes in the
Building unless such change is required by the par-
ticular use of the Premises being made by Tenant.
Tenant may at its own expense contest any such law,
ordinance, order, regulation or requirement, pro-
vided that Landlord is not subjected to criminal
prosecution and that Landlord's title to the Prem-
ises is not subjected to forfeiture. Tenant shall de-
fend, indemnify and hold Landlord harmless from and
against any liability as a result of any such contest.
Whenever any such requirement becomes final, Tenant
shall diligently comply therewith.

b) Tenant shall at all times keep the Premises,
the adjacent walkways and any loading platform,
service areas and freight elevators allocated to
Tenant's use, whether or not exclusive, clean and
free from rubbish and dirt. Tenant shall store in
a suitable place on the Premises not offensive to
other tenants all trash and garbage and arrange for
its regular pickup at Tenant's expense. Tenant shall
not burn any trash or garbage of any kind in or about
the Premises or the Center. Tenant may build suitable
enclosure or container for trash on exterior of
Premises.

11. HEATING AND AIR CONDITIONING; LIGHTING; PLUMBING.

a) Tenant shall maintain in good order and re-
pair the plumbing, sewer, heating, ventilating and
air conditioning equipment in the Premises, pro-
vided, however, Landlord agrees that as of the date
of occupancy of the Premises by Tenant, said plumb-
ing and heating, ventilating and air conditioning
equipment will be in good working order or that
Landlord shall bear the expense of putting such
equipment in good working order.

b) Tenant shall keep all electric signs and
other exterior lighting and all display lighting
turned on and well lighted during hours when such
lighting is appropriate and on such days and during
such reasonable hours as Tenant is open for business.

c) Plumbing facilities in the Premises shall
not be used for any purpose other than that for
which constructed, and no foreign substance of any
kind shall be deposited in the plumbing facilities.
The expense of any breakage, stoppage or damage
to plumbing facilities shall be borne by Tenant up
to point where same connects to main sewer line.

12. UTILITIES. Tenant shall pay all charges for utility
services supplied to the Premises and all connection and service
charges, and all costs of operating and maintaining the equipment
therefor. If Landlord elects to provide water, gas, steam, elec-
tricity, chilled water, hot water or any other utility service to
Tenant, Tenant shall purchase its requirements for such utility

Page .

ably calculated basis and shall not exceed the charges that would
have been made by the public utility company serving the Premises.
Landlord may at any time discontinue furnishing any utility service
furnished by Landlord without obligation to Tenant other than to
connect the Premises to the public utility then furnishing the ser-
vice, at no cost to Tenant.

## 13. LEASEHOLD IMPROVEMENTS.

a) Tenant shall have the right to remodel
the interior and exterior of the premises including
that area directly in front of the entrance to
the Premises shown as Tract 10 on Exhibit A on
and after the date of this Lease. Such remodeling
shall include any appropriate signs designating
Tenant's restaurant to be affixed to or on the
exterior of the Premises and/or on adjacent roadways
not to obstruct existing signs or violate municipal
ordinances.

b) Tenant shall have the right at its option
at any time to construct an addition to the Premises
on the north and west sides thereof and such addition
shall be built in general conformance to the existing
Center.

c) All leasehold Improvements made by Tenant
shall be made in good and workmanlike manner, and
in compliance with applicable building codes, regu-
lations and ordinances. All such work shall be dil-
igently prosecuted to completion.

d) On any construction requiring an expenditure
of $5,000.00 or more, Tenant shall furnish Landlord
with a good and sufficient bond written by a repu-
table company guaranteeing the completion thereof
and the payment therefor. A letter of credit from
a bank or lending institution shall also be suffi-
cient.

e) Tenant upon completion of additions remodeling
or repair shall furnish plans and specifications there-
of to Landlord so that in event of insurable loss Land-
lord may commence without delay to rebuild or repair.

## 14. LANDLORD'S REPAIRS.

a) Landlord shall keep in good order, con-
dition and repair the structural parts, exterior
foundations, exterior walls (except for interior
faces), downspouts, gutters and the roof of the
Building, and the plumbing and sewage system out-
side the Building after it connects to the common
sewer line, except (as to all items) for damage
caused by any negligent act or omission of Tenant
or its employees, agents, licensees or contractors.
"Structural parts" shall mean only the foundations,
exterior walls, concrete slabs, the beams and col-
umns bearing the main load of the roof and floors
(but not floor coverings). Landlord shall not be
responsible for Tenant's additional structures.

b) Notwithstanding the provisions of sub-

**Page 7**

terior or interior of any doors, windows, plate
glass, or showcases surrounding the Premises, or
the store front; (ii) heating, ventilating or air
conditioning equipment in the Premises.

15. **TENANT'S REPAIRS.** Tenant shall keep and maintain all
and every part of the Premises in good order, condition and repair,
including, without limitation, all Leasehold Improvements, all heat-
ing, ventilating, air conditioning, interior plumbing and interior
sewage facilities up to common sewer, and all interior walls (including
interior faces of exterior walls), floor coverings, ceilings, appli-
ances and equipment, all doors, exterior entrances, windows and win-
dow mouldings, plate glass, signs and showcases surrounding the Premises
and the store front.

16. **TENANT'S LIENS AND TAXES.**

a) Tenant shall pay, when due, all money that
may become due for any labor, services, materials,
supplies or equipment furnished to Tenant in, at,
upon or about the Premises and which may be secured
by any mechanic's, materialsman's or other lien
against the Premises or Landlord's interest therein.

b) Tenant shall pay before delinquency all
taxes, assessments, license fees and public charges
levied, assessed or imposed upon Tenant's Trade
Fixtures, merchandise and other personal property in
the Premises.

17. **LANDLORD'S ACCESS TO PREMISES.** Landlord and its agents
and representatives may enter the Premises at all reasonable hours,
and in emergencies at all times, to inspect and make repairs.

18. **ADDITIONS TO CENTER.** Landlord and Tenant agree that
neither will construct or permit to be constructed any buildings, im-
provements or additions in the Center which would restrict the present
visibility of Premises from adjacent streets or impair accessibility
to the Center or existing Premises.

19. **OPERATION OF COMMON AREAS.**

a) Landlord shall at its expense maintain
the Common Areas and the Parking Areas, substan-
tially as shown on Exhibit A, and throughout the
term hereof operate and maintain the Common Areas
for the use and benefit of the tenants of the Cen-
ter and their customers and invitees. Landlord
shall at all times have exclusive control of the
Common Areas subject only to the requirements of
this Lease.

b) Tenant shall not create any obstructions on
the Common Areas, except as shown on Exhibit A as
entrance area and agreed upon landscaping. Tenant
shall permit the use of the Common Areas only for
normal parking and ingress and egress by its customers
and suppliers to and from the Premises. Landlord,

Tenant and others constructing improvements or making repairs or alterations in the Center shall have the right to make reasonable use of portions of the Common Areas while making such repairs and alterations.

20. **PARKING AREAS.**

a) Landlord shall keep parking areas together with access road properly marked, drained and in good repair. The Parking area in the Center may not be reduced without the written permission of Tenant.

b) Landlord shall cause the parking areas for customers and employees to be adequately lighted until 12:00 o'clock midnight every day in which the Tenant is open for business. Tenant agrees to pay a pro-rata portion of the gross expense of maintenance and services required in connection with the operation of the parking lot and other common areas and services, such as lighting, snow removal, restriping of parking areas, and additions or changes in lighting of parking area, and the expenses of attendants, if such expenses are not otherwise adequately provided for; such expense shall be pro-rated in accordance with ratios based on floor area; provided tenants liability shall be limited to 15¢ per square foot with a maximum liability of $2000.00. New leases negotiated by Lessor shall contain comparable or better parking and common area up-keep provisions.

c) Tenant agrees to belong to Merchants Association organized by tenants of the Center and pay a fee based upon the same sort of allotment charged to Walgreens and to Penney's or a combination thereof that would be fair and equitable. Landlord agrees that all new tenants will agree to belong to said association on comparable or greater terms.

21. **INDEMNITY.**

a) Tenant shall defend and indemnify Landlord and save it harmless from and against any and all liability, damages, costs or expenses, including attorneys' fees, arising from any act, omission or negligence of Tenant, or its contractors, licensees, agents, servants or employees, or arising from any accident, injury or damage, howsoever and by whomsoever caused, to any person or property, occurring in the Premises or any part thereof, and any loading dock used exclusively by Tenant, unless such accident, injury or damage shall arise from Landlord's negligence or the negligence of some other tenant of Landlord.

b) Landlord shall indemnify and hold Tenant harmless from any liability for loss or damage caused by Landlord or his agent's negligence including attorney fees (excepting that resulting from the negligence of Tenant,

Page 9

its agents, servants and employees) occurring to cus-
tomers or other invitees of Tenant in the Common
Areas.

22.  BOILER LIABILITY INSURANCE.  Each party shall carry its
own liability insurance.  Lessee shall carry boiler insurance if Lessee
installs boiler rated to carry pressure in excess of 15 pounds per
square inch.  The boiler insurance policy shall be a primary policy,
non-contributing with Landlord's other coverage.  Such insurance shall
be in amounts of not less than Three Hundred Thousand Dollars ($300,000.0
for any person injured or killed, Five Hundred Thousand Dollars
($500,000.00) for any one accident and One Hundred Thousand Dollars
($100,000.00) for property damage.

23.  FIRE INSURANCE.  Landlord shall keep said building and
any additions thereto (increased premiums by reason of additions to
be paid by tenant) insured against loss or damage by fire and all
other casualties (except earthquake insurance) insurable under full
standard extended coverage and vandalism insurance in an amount ade-
quate to prevent Landlord from becoming a co-insurer of the Premises.
In event of a partial loss of 50% or less Landlord shall repair, re-
store or rebuild said building to its condition as was immediately
prior to its destruction or damage.  Landlord is to keep said building
insured by fire, extended coverage and vandalism in an amount equal
to 90% of the full replacement value of the building.  Said insurance
shall be carried in the name of Landlord and the policy shall expressly
provide that it shall not be cancelled or altered without 30 days
prior written notice to Lessee.  A duplicate certificate or copy of
said insurance shall be delivered to Lessee within 30 days after the
issuance thereof.

24.  WAIVER OF SUBROGATION.  Each party hereby waives all
rights against the other in respect of any loss or damage for which
(but only to the extent that) such party has been compensated under
any policy of insurance carried by it or for its benefit; provided
each party's insurance carrier consents to such waiver and waives
all rights of subrogation against the other party.

25.  INSURANCE POLICY FORMS.  All insurance required herein
of either party hereto shall be issued by responsible companies,
reasonably acceptable to the other party.  Either party's obligation
to carry any of the insurance provided for herein may be fulfilled
by coverage of a so-called blanket policy carried and maintained by
such party, provided that (i) a certificate of such insurance shall
be delivered to the other party;(ii) the coverage afforded the other
party shall not be reduced by reason of the use of such blanket
policy; and (iii) the other party may at all reasonable times inspect
the policy.

26.  DAMAGE AND RECONSTRUCTION.

a)  If the Premises shall be damaged by fire
or other casualty, Landlord shall repair or re-
build the Premises as speedily as possible, except
as provided below.  Should there be a substantial
interference with Tenant's business, the Minimum
Rent shall be abated justly and proportionately
with the degree to which Tenant's use of the Premises
is impaired until the Premises are restored.  To the

extent reasonably practicable Tenant shall continue
its business in the Premises during any such period
and all of Tenant's other obligations hereunder shall
remain in full force, and effect.

b) If Premises shall, for any reason be destroyed,
Landlord may elect within 90 days whether to rebuild the
leased Premises and shall notify Tenant in said time.
If Landlord elects to rebuild, Landlord shall have 5
months after so electing to complete the building.
Work interruption or delay in rebuilding caused by
fire, strike, riot, insurrection, weather, riot, act
of God or for any reason beyond Landlord's control
shall extend said 5 month period accordingly and lost
time arising from such cause or causes shall not be
used to compute the 5 month limitation.  If Landlord
elects to rebuild then Lessee shall as soon as prac-
ticable and with dispatch enter upon the Premises to
do those things necessary to make said Premises ready
to open for business.  Tenant shall have seven months
without paying rent in which to rebuild Tenant's part
of the Premises.  Thereafter Tenant shall have 3 months
to complete its portion thereof but Tenant shall pay
a rental of $1000.00 per month.  Thereafter Tenant
shall pay full rental whether or not Tenant is open
for business.  It is understood that Tenant shall pay
full rent from the time Tenant opens for business.
In computing 7 month period in which Tenant is re-
building without rent, "downtime" caused by fire, in-
surrection, strike, riot, weather, act of God or any
reason beyond Lessee's control, shall not be used in
computing said 7 month period and said period shall be
extended accordingly.

c) If Landlord does not elect to rebuild then
this lease shall be null and void.

d) The parties agree that at the time of the
signing hereof that the value of the Premises leased
is $375,000.00 and Landlord is to pay its pro-rata
part of the insurance required in Paragraph 23 supra.
Landlord is also to pay increased premium caused by
Tenant operating a restaurant on said Premises.  How-
ever, increased premiums caused by increased valua-
tion due to Tenant's betterment of or addition to the
leased Premises shall be borne by Tenant.  Increased
premiums caused by natural appreciation (if any) shall
be borne proportionately by both parties.  The pro-
portion shall be based on the value of the Premises
when completed by Tenant as compared to the agreed
value of $375,000.00 at the signing of this lease.

e) The parties hereto agree that 1972 shall be
considered as the base tax year.  When Landlord re-
ceives tax bill or bills reflecting increased assess-
ment by reason of Tenant's improvements, the break-
down will be ascertained for the amount of tax attri-
butable to Tenant's improvements.  Tenant shall pay
same within 30 days after being billed therefor by

Landlord. In addition thereto Tenant shall pay in-
creased taxes resulting from normal appreciation.
Tenant's portion of taxes shall be based pro-rata
on the square footage occupied by Tenant as compared
with total rentable space in the Center.

f)  In the event the Premises is 51% or more
destroyed and Landlord elects not to rebuild, then
insurance proceeds derived from insurance required
under Paragraph 23, supra, shall be divided between
Landlord and Tenant in proportion to the per cent-
age of insurance premium that each is paying under
Paragraph 26 d), supra.

g)  If destruction of 50% or more of the Premises
occurs after the 6th year of the primary term or the
6th year of any secondary terms hereunder, Landlord
shall not be obligated to replace said building un-
less Tenant agrees to exercise its next ensuing 10-
year option as set out in paragraph 3 supra.

h)  Tenant agrees to install and maintain to
insurance company's satisfaction, a sprinkler system
and adequate hood protection of the "ansul system"
type. If Tenant does not install and maintain such
sprinklers and hood protection systems then Tenant
shall pay increased insurance rates by reason thereof.

27.  CONDEMNATION.

a)  If title to, or an estate for years in, all
of the Premises shall be condemned (which shall
include any taking for a public or quasi-public
use under any statute, or by right of eminent do-
main, or by sale under threat of eminent domain)
or if title to so much of the Premises shall be
condemned that reasonable reconstruction of the
Premises will not result in their being reasonably
suitable for Tenant's continued occupancy, then
in either event, this Lease shall terminate on the
date physical possession of all or part of the
Premises is taken.

b)  If any part of the Premises shall be con-
demned and the remaining part (after restoration
of the then existing Building) is reasonably suit-
able for Tenant's continued occupancy, this Lease
shall, as to the part taken, terminate as of the
date possession of such part is taken and the Mini-
mum Rent shall be reduced in the same proportion
that the floor area of the portion of the Premises
taken (less any additions to the Premises by recon-
struction) bears to the original floor area of the
Premises. Landlord shall at its own expense make
all necessary repairs or alterations to the Building
so as to constitute the portion of the Building
not taken as a complete architectural unit and the
remaining Premises a complete merchandising unit.

The provisions of subparagraphs (a) and (b) of Paragraph 26 (except the first sentence thereof) shall apply until such repairs and alterations have been completed.

c) If any portion of the Parking Areas shall be condemned, the number of parking spaces Landlord is required to maintain hereunder shall be reduced by the same percentage that the total area of the Parking Areas was reduced by such taking, and Landlord shall use its best efforts to rearrange and realign the Parking Areas so as to minimize the actual loss of parking spaces, consistent with good operating practice. If so much of the Parking Areas shall be condemned that the number of automobile parking spaces in the Center is reduced which reduction shall materially interfere with business of Tenant, Tenant, upon sixty (60) day's notice to Landlord, may terminate this Lease. If before the effective date of such notice sufficient substitute parking spaces shall have been provided, such notice shall become ineffective; otherwise this Lease shall terminate on the sixtieth (60th) day after delivery of said notice and rent shall be adjusted to the date of termination.

28. DEFAULT AND REMEDIES.

A.    If Tenant, after notice, fails to remedy any default (a) in the payment of any sum due under this Lease for fifteen (15) days after receipt of notice, or (b) fails to initiate reasonable steps to cure default in any other covenant or condition of this Lease with all reasonable dispatch, commencing not later than thirty (30) days after receipt of notice, then, in addition to any other remedy Landlord may have by law, Landlord may without further demand or notice, and without hindrance from Tenant or liability in damages or being guilty of trespass or forceable entry, re-enter and eject all persons from the Premises, using all necessary force to do so, and may

i) terminate this Lease (and Landlord's election to terminate shall be evidenced only by Landlord's written notice to Tenant specifically so stating),

ii) terminate right of Tenant to possession without terminating this Lease, relet all or any part of the Premises as the agent of and for the account of Tenant upon such terms and conditions as Landlord may deem advisable, in which event the rents received on such reletting shall be applied first to the expenses of reletting and collection, including necessary renovation and alterations of the Premises, reasonable attorneys' fees and any real estate commissions paid, and thereafter to payment of all sums due or to become due Landlord hereunder and Tenant shall be liable for the balance

tion of the then existing term of this Lease, said sums payable monthly.

B. Any disagreement between the parties with respect to the interpretation or application of this lease or the obligations of the parties hereunder shall be determined by arbitration. Such arbitration shall be conducted, upon request of either the Landlord or the Tenant, before three arbitrators (unless the Landlord or the Tenant agree to one arbitrator) designated by the American Arbitration Association and in accordance with the rules of such Association. The arbitrators designated and acting under this lease shall make their award in strict conformity with such rules and shall have no power to depart from or change any of the provisions thereof. The expense of arbitration proceedings conducted hereunder shall be borne equally by the parties. All arbitration proceedings hereunder shall be conducted in the City of Denver, Colorado.

29. ATTORNEYS' FEES. If suit is brought by either party against the other arising out of or based upon a provision of this Lease, the losing party shall pay to the prevailing party all costs of such suit and a reasonable attorneys' fee which shall be fixed by the Court.

30. SUBORDINATION. This Lease shall automatically be subordinate to any mortgage or deed of trust hereafter placed upon the Premises, to any and all advances made or to be made thereunder, to the interest on the obligations secured thereby and to all renewals, replacements and extensions thereof; provided, however, that (i) in the event of foreclosure of any such mortgage or deed of trust or exercise of the power of sale thereunder, Tenant shall attorn to the purchaser of the Premises at such foreclosure or sale and recognize such purchaser as the Landlord under this Lease, and (ii) notwithstanding any such foreclosure or sale this Lease shall remain in full force if Tenant is not in default hereunder. Tenant shall promptly execute, acknowledge and deliver to Landlord any subordination agreement or other instrument that Landlord may reasonably request to carry out the intent of this Article.

31. ESTOPPEL CERTIFICATES. Tenant shall from time to time, upon not less than ten (10) days' prior request by Landlord, execute, acknowledge and deliver to Landlord a statement in writing certifying, if such be true, that this Lease is unmodified and in full force and effect (or if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and the dates to which the Minimum Rent, Percentage Rent and other charges have been paid, it being intended that any such statement may be relied upon by any prospective purchaser or encumbrancer of the Premises.

32. QUIET ENJOYMENT. Landlord agrees that Tenant, upon paying the rent and performing the covenants and conditions of this Lease, may quietly have, hold and enjoy the Premises during the term hereof and any extension thereof.

33. **HOLDING OVER.** If Tenant remains in possession of the Premises after expiration of the Lease term without executing a new Lease or exercising option to renew as in Paragraph #3a), such holding over shall be construed as a tenancy from month-to-month, subject to all covenants and conditions of this Lease. During such tenancy Percentage Rent shall be at a monthly rate, payable in advance, equal to the rate during the last Lease Year. Tenant must give Landlord 60 days notice of Tenant's intention to vacate premises.

34. **OBLIGATION OF TENANT ON SURRENDER.** On the date of termination of this Lease, Tenant shall quit and surrender the Premises, broom clean, in good condition and repair (reasonable wear and tear and damage by act of God excepted). At or before the end of the Lease term, Tenant shall remove all of its property from the Premises. All property not so removed shall be deemed abandoned. If the Premises be not surrendered at the end of the Lease term in accordance with the provisions of this Paragraph, Tenant shall indemnify Landlord against any loss or liability, and reimburse Landlord for any expense incurred by it, resulting from delay (including, without limitation, any claim made by a succeeding tenant founded on the delay) or other default by Tenant in surrendering the Premises.

35. **TENANT'S RIGHT OF FIRST REFUSAL.**

a) If Landlord elects to sell the Center or any portion thereof during the term of this lease or any extension thereof, it shall give the Tenant thirty (30) days' written notice of the proposed sale and the terms thereof. Tenant shall have the first option to purchase the Center or portion thereof on the terms set out by Landlord. Should Tenant not elect within said thirty (30) day period to so purchase on terms of sale as set out in writing by Landlord, Landlord shall have 1 year thereafter to sell on such terms. If a sale is to be made on different terms, said terms must be again submitted to Tenant for his acceptance or rejection. Tenant shall also have right of first refusal to lease the Center or a portion thereof on the same terms and conditions herein contained pertaining to the sale thereof with the exception that Tenant shall have only 5 days to elect whether to accept a lease or refuse same. If option to purchase or lease a portion of the Center is not exercised, right of first refusal shall remain in effect as to remaining portions of the Center.

36. **LANDLORD'S CONVEYANCE.** If Landlord shall sell its interest in the Center or in the Premises, then from and after the effective date of the sale, Landlord shall be released and discharged from all obligations under this Lease, except those already accrued; provided Landlord's assignees will assume all the duties and obligations of the Landlord to the Tenant as contained in this Lease. The assignor or assignors of the Landlord shall consist of persons, firms or corporations capable of financially responding to the Tenant for any damages incurred by Tenant by reason of assignees breach of any of the terms hereof.

37. <u>CONTINGENCIES</u>. Notwithstanding any other provision hereof, this Lease shall be null and void and of no further force and effect and any moneys paid hereunder shall be returned if (i) Tenant is unable to secure all governmental (state, county and municipal) approvals, licenses or permits necessary to conduct a restaurant upon the Premises; or (ii) Tenant is unable to secure all governmental (state, county or municipal) approval, licenses or permits to improve the Premises by remodeling and redecorating as contemplated herein; or (iii) Landlord has previously granted to any other Tenant in the Center the exclusive right to operate a restaurant in the Center.

37A. <u>ADDENDUM TO PARAGRAPH 35 a)</u>. Paragraph 35 a) shall apply to the restaurant now on the Premises and operated by Denver Drumstick Incorporated with the proviso that if Denver Drumstick, Incorporated makes a bona-fide acceptable offer to purchase, then Tenant may purchase according to said offer by paying in addition thereto the value of the improvement (building) built on the leased premises by Denver Drumstick, Inc.. If the value of the building cannot be agreed upon then the matter shall be submitted to arbitration as herein provided.

37B. <u>ADDENDUM TO PARAGRAPHS 4 and 13</u>. Should the Tenant elect to construct an addition to the Premises under Paragraph 13 b), Tenant shall not be charged any additional base rent for such addition. However, percentage rent or overage shall apply as provided in Paragraph 5 hereof.

37C. <u>ADDENDUM TO PARAGRAPH 27</u>. If Property is condemned, then condemnation award shall be divided between Landlord and Tenant as their interests may appear. If Parties cannot agree as to a division of the proceeds then the matter shall be submitted to arbitration as herein provided.

Page 16

38. **NOTICES.** All notices, statements, demands, requests, consents, approvals, authorizations, offers, agreements, appointments or designations under this Lease by either party to the other shall be in writing and shall be sufficiently given and served upon the other party if sent by United States certified or registered mail, postage prepaid, and addressed as follows (or to such other place as either party may from time to time designate by notice to the other):

If to Tenant:

Casa Bonita of Tulsa, Inc.
2120 S. Sheridan Road
Tulsa, Oklahoma 74129

If to Landlord:

J. C. R. S. Shopping Center, Inc.
6647 W. Colfax
Lakewood, Colorado 80214

39. **RIGHT TO SELL, SUBLET AND ASSIGN THE LEASE.** Tenant shall have the right to sell, sublet or assign its leasehold estate without prior consent or approval of Landlord so long as Tenant remains liable and sub-lessee does not interfere with vested lease rights of other tenants.

40. **TERMS AND TIME.** Each provision of this Lease performable by either party hereto shall be construed to be both a covenant and a condition. Whenever required by the context in this Lease, the singular number shall include the plural, the neuter gender shall include the masculine and feminine genders, and the word "person" shall include corporation, firm or association. Every payment required to be made by Tenant hereunder shall be in addition to and not in substitution for any other payment to be made by Tenant.

41. **MISCELLANEOUS.**

a) Nothing herein contained shall be deemed or construed by the parties hereto, nor by any other party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of rent, nor any other provision, contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant. Whenever herein the singular number is used, the same shall include the plural, and words of any gender shall include each other gender.

b) The captions used in this Lease are for convenience only and do not in any way limit or amplify the terms and provisions hereof.

c) One or more waivers of any covenant, term or condition of this Lease by either party shall

not be construed as a waiver of a subsequent
breach of the same covenant, term or condition.
The consent or approval by either party to or of
any act by the other party requiring such consent
or approval shall not be deemed to waive or ren-
der unnecessary consent to or approval of any
subsequent similar act.

d) This Lease contains the entire agreement
between the parties, and no agreement, representa-
tion or inducement shall be effective to change,
modify or terminate this Lease in whole or in part
unless such agreement, representation or induce-
ment is reduced to writing and signed by both
parties hereto.

EXECUTED the day and year first above written.

ATTEST:                                    J.C.R.S. SHOPPING CENTER, INC.

_____                    By _____
        Secretary                                    President
(SEAL)
                                                    "LANDLORD"

ATTEST:                                    CASA BONITA OF TULSA, INC.

_____                    By _____
        Secretary                                    President
(SEAL)
                                                    "TENANT"

# EXHIBIT "B"

**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012-1927
(602) 271-4250
(602) 271-4300 FAX
S. CARY FORRESTER (006342)
SCF@FORRESTERANDWORTH.COM

COUNSEL FOR DEBTORS

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | **Chapter 11** |
| **STAR BUFFET, INC.,** | **Jointly Administered** |
| Debtor. | **Case Nos.: 2:11-bk-27518 and 2:11-bk-27713** |
| In re: | |
| **SUMMIT FAMILY RESTAURANTS, INC.,** | **DECLARATION OF RONALD DOWDY IN SUPPORT OF MOTION FOR APPROVAL OF ASSUMPTION OF LEASE WITH J.C.R.S. SHOPPING CENTER, INC.** |
| Debtor. | |
| THIS FILING APPLIES TO: | |
| _____ BOTH DEBTORS | |
| _____ STAR BUFFET, INC. | |
| _X_ SUMMIT FAMILY RESTAURANTS, INC. | |

Ronald Dowdy hereby states as follows under penalty of perjury.

1. I am the Secretary/Treasurer of Summit Family Restaurants, Inc. (**"Summit"**). My duties are equivalent to those of a chief financial officer.

2. I am also the Secretary/Treasurer of Summit's parent, Star Buffet, Inc. (**"SBI"**), which is a publicly traded restaurant holding company.

3. I make this declaration in support of Summit's Motion for Approval of Assumption of Lease with J.C.R.S. Shopping Center, Inc. (the "**Motion**").

4. SBI and its subsidiaries lease or own 34 restaurants in 13 states.

5. Summit leases or owns nine restaurants, which employ approximately 500 people.

6. On November 1, 1972, Casa Bonita of Tulsa, Inc. ("**CBTI**") and J.C.R.S. Shopping Center, Inc. ("**JCRS**") entered into a lease of the real property located 6715 W. Colfax, Denver, Colorado, 80214 (the "**Casa Bonita Restaurant**"). Summit is the successor-in-interest to CBTI.

7. The Lease has been extended three times and now expires on October 31, 2013.

8. The minimum monthly lease payments are approximately $2,916.67. Summit pays additional rent equal to the difference between 1.5% of gross sales and the amount of the minimum rent. The required monthly payments under the Lease are paid current.

9. A copy of the Lease is attached to the Motion as Exhibit "A".

10. The Casa Bonita Restaurant Property generated more than $1.4 million in operating profit in FY 2011, and is projected to generate more than $1.3 million in operating profit in FY 2012. It is the most profitable restaurant in the SBI family of companies.

11. By assuming the Lease, Summit is seeking to preserve its most valuable asset and to protect the jobs of the restaurant employees.

12. Summit's ability to perform in the future is evidenced by the cash flow generated from the Casa Bonita Restaurant, the lack of any existing defaults, and the profitability of Summit and its parent, SBI, going forward.

- 2 -

13.     Spreadsheets showing Summit's historical and projected cash flows are attached hereto as Group Exhibit 1. Exhibit 1 shows that Summit generated net operating income of $1,522,561 in FY 2011, and will generate net operating income of $2,017,743 in FY 2012 and an additional $2,337,958 in FY 2012.

14.     Exhibit 1 also shows that Summit's parent company, SBI, generated net operating income of $4,383,848 in FY 2011, and will generate net operating income of $3,123,848 in FY 2012 and an additional $3,653,687 in FY 2012. In each case, the net operating income will continue to increase over time.

15.     Summit's ability to perform is also demonstrated by the fact that it has remained current on its rent payments, even during the recent recession.

16.     SBI has already completed most, if not all, of the cost saving measures required to cope with the downturn in the economy, and Summit and SBI have already returned to profitability. For example, since the recession began in 2008, management staff has been reduced from 13 employees to 6, overall administrative expenses have been reduced from approximately $3.8 million to approximately $1.6 million, and 35 restaurants have been closed or leased to third parties.

Ronald Dowdy

# EXHIBIT "1"

# FINANCIAL PLAN SUMMARY

## *Cashflow Summary III*

## Star Buffet, Inc.

| Restaurants | FY11 Actual | FY12 Fcst | FY13 Plan | FY14 Plan | FY15 Plan | FY16 Plan |
|---|---|---|---|---|---|---|
| 306 Beeville | - | - | 6,814 | 18,252 | 18,252 | 18,252 |
| 423 Magnolia | - | - | 20,510 | 31,677 | 38,600 | 38,600 |
| 476 Sierra Vista | - | - | - | 18,384 | 44,700 | 44,700 |
| 304 Tucumcari | (12,786) | 3,247 | (11,277) | (11,277) | (3,044) | (2,624) |
| 307 Lamesa | 84 | (34,273) | 16,259 | 16,259 | 16,259 | 18,753 |
| 308 Dumas | 158,327 | 151,931 | 170,824 | 170,824 | 170,824 | 173,717 |
| 341 Artesia | 269,933 | 246,625 | 271,583 | 271,583 | 271,583 | 275,554 |
| 342 Dalhart | 158,940 | 151,647 | 151,779 | 151,779 | 151,779 | 154,307 |
| 361 Denver | 1,597,505 | 1,436,488 | 1,727,422 | 1,727,422 | 1,727,422 | 1,746,348 |
| 376 Helena | - | (23,378) | 52,113 | 52,113 | 52,113 | 53,871 |
| 378 Vernal | 261,509 | 291,938 | 258,983 | 258,983 | 258,983 | 262,021 |
| 379 Richfield | 3,905 | (1,095) | (4,716) | (4,716) | 1,323 | 2,572 |
| 383 Great Falls | 260,142 | 283,210 | 229,899 | 236,545 | 236,545 | 240,163 |
| 384 Billings | 50,824 | 119,963 | 119,008 | 119,008 | 119,008 | 122,192 |
| 388 Couer D'alene | - | 2,716 | 21,213 | 21,213 | 21,213 | 23,888 |
| 389 Rexburg | 85,145 | 73,072 | 79,314 | 79,314 | 79,314 | 80,892 |
| 391 Miles City | 108,937 | 112,344 | 103,761 | 103,761 | 103,761 | 106,539 |
| 392 Great Falls | 127,587 | 112,432 | 110,363 | 110,363 | 110,363 | 112,179 |
| 393 Havre | 201,778 | 156,663 | 179,149 | 179,149 | 179,149 | 181,527 |
| 394 Deer Lodge | 82,847 | 80,380 | 81,498 | 81,498 | 81,498 | 83,594 |
| 385 Butte | 20,832 | 9,793 | 20,401 | 20,401 | 20,401 | 21,746 |
| 396 Polson | 148,344 | 176,753 | 215,232 | 215,232 | 215,232 | 218,127 |
| 397 Missoula | 4,988 | 146,013 | 143,513 | 143,513 | 143,513 | 146,505 |
| 409 Grants Pass | (23,860) | (36,762) | - | - | - | - |
| 422 Magee | 97,792 | 79,451 | 85,279 | 85,279 | 85,279 | 88,046 |
| 445 Titusville | 66,396 | 71,430 | 70,238 | 70,238 | 70,238 | 74,091 |
| 462 Plant City | 211,862 | 221,023 | 210,346 | 210,346 | 210,346 | 215,303 |
| 466 Ormond Beach | 27,444 | 5,637 | 16,920 | 16,920 | 16,920 | 18,464 |
| 522 Scottsdale | 122,690 | 90,384 | 110,730 | 110,730 | 110,730 | 114,504 |
| 533 Yuma | 202,708 | 107,075 | 150,778 | 150,778 | 150,778 | 154,917 |
| 551 Huntsville | (500) | (20,610) | (31,525) | (31,525) | (5,737) | (3,060) |
| 553 Jonesboro | 104,604 | 120,068 | 66,886 | 66,886 | 77,792 | 82,103 |
| 567 Tupelo | 13,286 | 4,393 | 13,517 | 13,517 | 13,517 | 17,509 |
| 573 Jackson, TN | 32,585 | (59,188) | - | - | - | - |
| | | | | | | |
| Totals | 4,383,848 | 4,079,390 | 4,656,814 | 4,704,449 | 4,788,654 | 4,884,504 |

-14 C-

Case 2:11-bk-27518-GBN    Doc 79    Filed 01/25/12    Entered 01/25/12 15:27:43    Desc
Main Document      Page 33 of 39

# FINANCIAL PLAN SUMMARY

## FY'11 Act.

| Unit | Total Sales | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert % | Utilities % | Other Controll % | Unit Profit $ | Unit Profit % | Fixed & Occ % | Operating Profit $ | Operating Profit % | Cash Flow $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 304 Tucumcari | 519,232 | 39.79 | 23.18 | 9.66 | 4.84 | 37.67 | - | 1.02 | 6.66 | 4.81 | 52,219 | 10.06 | 71.18 | (317,358) | (61.12) | (12,786) |
| 307 Lamesa | 983,663 | 42.62 | 22.10 | 6.45 | 5.18 | 33.73 | - | 1.50 | 7.41 | 6.51 | 81,063 | 8.24 | 43.59 | (347,694) | (35.55) | 84 |
| 308 Dumas | 1,077,609 | 38.03 | 20.40 | 6.67 | 5.07 | 32.13 | - | 4.25 | 3.38 | 6.17 | 172,924 | 16.05 | 3.57 | 134,456 | 12.48 | 158,327 |
| 341 Artesia | 1,518,028 | 43.04 | 20.81 | 4.54 | 3.95 | 29.30 | - | 0.50 | 2.65 | 5.79 | 284,231 | 18.72 | 3.92 | 224,728 | 14.80 | 269,933 |
| 342 Dalhart | 973,400 | 43.70 | 18.40 | 6.51 | 3.74 | 28.65 | - | 0.75 | 4.34 | 4.75 | 173,415 | 17.82 | 4.91 | 125,576 | 12.90 | 158,940 |
| 361 Denver | 7,344,689 | 24.78 | 25.34 | 3.19 | 4.25 | 32.78 | 3.16 | 1.01 | 4.97 | 8.50 | 1,820,897 | 24.79 | 4.81 | 1,467,442 | 19.98 | 1,597,505 |
| 376 Helena | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 378 Vernal | 1,123,313 | 31.56 | 19.91 | 8.94 | 4.49 | 33.34 | - | 0.75 | 4.40 | 5.05 | 279,673 | 24.90 | 3.18 | 243,993 | 21.72 | 261,509 |
| 379 Richfield | 512,921 | 36.62 | 22.63 | 12.17 | 5.81 | 40.62 | - | 1.25 | 8.92 | 6.69 | 30,213 | 5.89 | 7.51 | (7,303) | (1.42) | 3,905 |
| 383 Great Falls | 1,447,473 | 34.27 | 22.84 | 7.71 | 4.94 | 35.49 | - | 1.00 | 4.65 | 4.99 | 283,704 | 19.60 | 3.86 | 227,815 | 15.74 | 260,142 |
| 384 Billings | 1,280,553 | 34.94 | 24.81 | 8.64 | 5.80 | 39.25 | - | 0.75 | 3.67 | 5.93 | 197,788 | 15.45 | 12.30 | 40,301 | 3.15 | 50,824 |
| 388 Coeur d'Alene | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 389 Rexburg | 668,798 | 34.46 | 21.16 | 10.94 | 5.25 | 37.34 | - | 0.75 | 6.33 | 6.47 | 98,008 | 14.65 | 6.62 | 53,766 | 8.04 | 85,145 |
| 391 Miles City | 1,051,290 | 32.85 | 25.83 | 7.13 | 5.23 | 38.18 | - | 0.50 | 3.94 | 4.84 | 206,905 | 19.68 | 11.13 | 89,921 | 8.55 | 108,937 |
| 392 Great Falls | 736,009 | 29.74 | 24.19 | 9.46 | 5.76 | 39.41 | - | 0.50 | 6.35 | 4.64 | 142,449 | 19.35 | 6.74 | 92,871 | 12.62 | 127,587 |
| 393 | 984,243 | 30.62 | 23.87 | 7.41 | 5.02 | 36.50 | - | 0.75 | 4.93 | 4.31 | 227,322 | 22.10 | 3.76 | 190,293 | 19.33 | 201,778 |
| 394 Deer Lodge | 789,415 | 34.65 | 25.99 | 8.03 | 4.76 | 38.78 | - | 0.75 | 4.94 | 5.18 | 123,913 | 15.70 | 7.89 | 61,634 | 7.81 | 82,847 |
| 395 Butte | 573,926 | 31.76 | 25.73 | 11.18 | 5.32 | 42.23 | - | 0.50 | 7.11 | 5.42 | 51,396 | 8.96 | 8.92 | 226 | 0.04 | 20,832 |
| 396 Polson | 1,088,955 | 31.76 | 22.27 | 6.57 | 2.92 | 31.77 | - | 0.75 | 3.82 | 4.93 | 293,619 | 26.96 | 15.83 | 121,248 | 11.13 | 148,344 |
| 397 Missoula | 231,746 | 34.38 | 23.67 | 7.68 | 4.39 | 35.74 | - | 0.65 | 4.96 | 3.19 | 48,830 | 21.07 | 18.95 | 4,914 | 2.12 | 4,988 |
| 409 Grants Pass | 1,080,724 | 37.36 | 28.22 | 10.77 | 5.88 | 44.86 | - | 0.75 | 6.48 | 4.70 | 63,067 | 5.84 | 65.62 | (646,150) | (59.79) | (23,860) |
| 422 Magee | 1,086,707 | 44.88 | 21.39 | 5.70 | 3.85 | 30.95 | - | 0.53 | 6.30 | 4.54 | 139,069 | 12.80 | 10.60 | 23,886 | 2.20 | 97,792 |
| 445 Titusville | 1,718,515 | 42.97 | 21.66 | 6.22 | 4.91 | 32.78 | - | 0.51 | 10.60 | 6.29 | 117,575 | 6.84 | 6.96 | (2,094) | (0.12) | 66,396 |
| 462 Plant City | 1,900,683 | 43.49 | 19.20 | 6.66 | 4.43 | 30.29 | - | 0.50 | 7.10 | 5.41 | 251,119 | 13.21 | 4.29 | 169,551 | 8.92 | 211,862 |
| 466 Ormond Beach | 687,604 | 35.81 | 24.31 | 6.80 | 5.11 | 36.22 | - | 0.50 | 9.39 | 3.77 | 98,418 | 14.31 | 13.20 | 7,627 | 1.11 | 27,444 |
| 522 Scottsdale | 1,710,077 | 42.16 | 21.47 | 6.37 | 3.51 | 31.35 | - | 0.25 | 7.64 | 5.17 | 229,727 | 13.43 | 11.39 | 35,024 | 2.05 | 122,690 |
| 533 Yuma | 1,891,939 | 38.15 | 22.01 | 7.73 | 3.69 | 33.42 | - | 0.25 | 7.25 | 5.14 | 298,592 | 15.78 | 10.50 | 99,907 | 5.28 | 202,708 |
| 551 Huntsville | 1,388,417 | 46.00 | 18.84 | 8.32 | 4.16 | 31.32 | - | 0.50 | 8.25 | 5.17 | 121,551 | 8.75 | 26.62 | (248,017) | (17.86) | (500) |
| 553 Jonesboro | 1,652,759 | 46.82 | 20.36 | 7.05 | 4.33 | 31.74 | - | 0.50 | 4.82 | 3.63 | 206,253 | 12.48 | 44.55 | (530,067) | (32.07) | 104,604 |
| 567 Tupelo | 1,794,080 | 47.40 | 18.81 | 9.57 | 4.13 | 32.51 | - | 0.50 | 5.63 | 6.62 | 131,700 | 7.34 | 17.44 | (181,223) | (10.10) | 13,286 |
| 573 Jackson | 1,656,883 | 40.56 | 21.40 | 8.12 | 4.69 | 34.21 | - | 0.50 | 8.76 | 6.47 | 158,336 | 9.50 | 20.56 | (184,328) | (11.06) | 32,585 |
| TOTAL | 39,485,630 | 36.74 | 22.53 | 6.83 | 4.50 | 33.86 | 0.59 | 0.79 | 5.93 | 5.92 | 6,383,956 | 16.17 | 13.76 | 950,947 | 2.41 | 4,383,848 |

**Star Buffet, Inc.**

-15 A-

# FINANCIAL PLAN SUMMARY

## Star Buffet, Inc.

### FY '12 Fcst

| Unit | Total Sales | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert % | Utilities % | Other Controll % | Unit Profit $ | Unit Profit % | Fixed & Occ % | Operating Profit $ | Operating Profit % | Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 304 Tucumcari | 540,652 | 38.67 | 19.56 | 10.73 | 5.05 | 35.34 | - | 1.25 | 4.40 | 8.89 | 61,990 | 11.46 | 13.54 | (11,290) | (2.09) | 3,247 |
| 307 Lamesa | 942,301 | 48.64 | 21.80 | 7.47 | 5.38 | 34.65 | - | 1.53 | 7.89 | 2.60 | 44,206 | 4.69 | 10.49 | (54,666) | (5.80) | (34,273) |
| 308 Dumas | 1,093,994 | 40.37 | 19.91 | 5.80 | 5.87 | 31.59 | - | 4.23 | 2.84 | 5.40 | 170,424 | 15.58 | 3.91 | 127,676 | 11.67 | 151,931 |
| 341 Artesia | 1,501,106 | 43.13 | 21.81 | 4.74 | 4.77 | 31.31 | - | 0.50 | 1.87 | 5.45 | 266,310 | 17.74 | 4.33 | 201,379 | 13.42 | 246,625 |
| 342 Dalhart | 955,178 | 44.61 | 19.02 | 5.36 | 4.67 | 29.04 | - | 0.50 | 3.68 | 4.28 | 170,903 | 17.89 | 5.67 | 116,758 | 12.22 | 151,647 |
| 361 Denver | 7,223,760 | 25.57 | 22.80 | 2.29 | 4.37 | 29.46 | 3.32 | 2.00 | 5.42 | 11.36 | 1,652,228 | 22.87 | 4.77 | 1,307,416 | 18.10 | 1,436,488 |
| 376 Helena | 615,866 | 36.62 | 28.88 | 12.80 | 5.84 | 47.51 | - | 0.75 | 6.00 | 4.81 | 26,549 | 4.31 | 8.24 | (24,185) | (3.93) | (23,378) |
| 378 Vernal | 1,150,059 | 31.77 | 19.01 | 8.20 | 4.56 | 31.77 | - | 0.75 | 3.05 | 5.59 | 311,311 | 27.07 | 3.06 | 276,110 | 24.01 | 291,938 |
| 379 Richfield | 473,583 | 40.03 | 20.76 | 12.88 | 4.73 | 38.37 | - | 1.25 | 8.92 | 5.15 | 29,762 | 6.28 | 8.96 | (12,648) | (2.67) | (1,095) |
| 383 Great Falls | 1,369,890 | 33.64 | 22.35 | 7.02 | 5.16 | 34.52 | - | 1.00 | 3.52 | 4.96 | 306,375 | 22.36 | 3.88 | 253,170 | 18.48 | 283,210 |
| 384 Billings | 1,204,839 | 36.23 | 24.51 | 7.63 | 5.81 | 37.95 | - | 0.76 | 4.03 | 4.79 | 195,572 | 16.23 | 7.19 | 108,963 | 9.04 | 119,983 |
| 388 Coeur d'Alene | 651,225 | 33.06 | 20.77 | 15.38 | 5.53 | 41.68 | - | 0.75 | 6.44 | 6.40 | 76,040 | 11.68 | 12.48 | (5,262) | (0.81) | 2,716 |
| 389 Rexburg | 598,192 | 35.48 | 21.21 | 11.00 | 5.34 | 37.55 | - | 0.50 | 7.84 | 4.19 | 84,802 | 14.18 | 7.36 | 40,790 | 6.82 | 73,072 |
| 391 Miles City | 1,051,776 | 34.32 | 24.15 | 7.29 | 5.60 | 37.04 | - | 0.52 | 3.76 | 5.06 | 203,284 | 19.33 | 10.47 | 93,146 | 8.86 | 112,344 |
| 392 Great Falls | 687,575 | 31.28 | 24.26 | 9.00 | 7.29 | 40.56 | - | 0.52 | 6.32 | 2.94 | 126,397 | 18.38 | 6.01 | 85,095 | 12.38 | 112,432 |
| 393 Havre | 899,327 | 32.02 | 24.96 | 7.23 | 5.26 | 37.45 | - | 0.74 | 8.64 | 2.40 | 168,687 | 18.76 | 2.65 | 144,836 | 16.10 | 156,693 |
| 394 Deer Lodge | 794,438 | 34.62 | 23.55 | 8.25 | 5.81 | 39.60 | - | 0.79 | 4.41 | 3.53 | 135,493 | 17.06 | 9.50 | 60,037 | 7.56 | 80,380 |
| 395 Butte | 509,906 | 35.24 | 24.93 | 11.47 | 5.73 | 42.12 | - | 0.51 | 4.57 | 4.57 | 37,487 | 7.35 | 9.00 | (8,394) | (1.65) | 9,793 |
| 396 Polson | 1,101,563 | 31.01 | 23.66 | 7.85 | 5.34 | 36.85 | - | 0.75 | 3.95 | 5.50 | 241,666 | 21.94 | 9.12 | 141,180 | 12.82 | 176,753 |
| 397 Missoula | 1,132,069 | 31.53 | 23.87 | 8.06 | 4.65 | 36.58 | - | 0.59 | 5.35 | 6.25 | 222,996 | 19.70 | 6.83 | 145,693 | 12.87 | 146,013 |
| 409 Grants Pass | 449,765 | 39.65 | 28.52 | 10.73 | 6.36 | 45.60 | - | 0.75 | 6.91 | 7.11 | (72) | (0.02) | 9.36 | (42,166) | (9.38) | (36,762) |
| 422 Magee | 1,048,163 | 46.07 | 20.50 | 5.35 | 4.99 | 30.84 | - | 0.50 | 4.89 | 5.93 | 123,427 | 11.78 | 11.29 | 5,116 | 0.49 | 79,451 |
| 445 Titusville | 1,464,717 | 43.91 | 18.54 | 5.89 | 3.61 | 28.04 | - | 0.50 | 10.00 | 9.63 | 116,114 | 7.93 | 8.47 | (7,969) | (0.54) | 71,430 |
| 462 Plant City | 1,876,342 | 42.49 | 18.84 | 5.49 | 4.57 | 28.91 | - | 0.51 | 7.45 | 6.08 | 273,497 | 14.58 | 5.34 | 173,265 | 9.23 | 221,023 |
| 466 Ormond Beach | 584,091 | 36.79 | 23.39 | 8.33 | 4.25 | 35.97 | - | 0.53 | 9.71 | 6.38 | 61,985 | 10.61 | 13.75 | (18,300) | (3.13) | 5,657 |
| 522 Scottsdale | 1,430,970 | 42.21 | 21.24 | 6.42 | 3.71 | 31.37 | - | 0.25 | 7.23 | 6.43 | 179,124 | 12.52 | 11.80 | 10,229 | 0.71 | 90,384 |
| 533 Yuma | 1,568,985 | 38.84 | 21.21 | 7.21 | 3.90 | 32.50 | - | 0.25 | 8.77 | 7.31 | 193,365 | 12.32 | 11.55 | 12,069 | 0.77 | 107,075 |
| 551 Huntsville | 1,018,628 | 43.11 | 18.41 | 9.58 | 5.25 | 33.25 | - | 0.50 | 6.26 | 8.31 | 87,315 | 8.57 | 11.43 | (29,125) | (2.86) | (20,610) |
| 553 Jonesboro | 1,632,682 | 48.71 | 18.90 | 6.42 | 4.35 | 29.66 | - | 0.50 | 3.96 | 2.85 | 233,760 | 14.32 | 7.80 | 106,402 | 6.52 | 120,068 |
| 567 Tupelo | 1,517,832 | 47.22 | 19.02 | 6.90 | 6.18 | 32.10 | - | 0.50 | 5.72 | 6.74 | 117,176 | 7.72 | 8.13 | (6,284) | (0.41) | 4,393 |
| 573 Jackson | 727,590 | 47.40 | 20.81 | 5.77 | 5.11 | 31.69 | - | 0.50 | 9.60 | 9.38 | 10,431 | 1.43 | 10.39 | (65,193) | (8.96) | (59,188) |
| TOTAL | 37,817,042 | 36.96 | 21.76 | 6.53 | 4.90 | 33.19 | 0.63 | 0.99 | 5.78 | 6.76 | 5,928,545 | 15.68 | 7.42 | 3,123,848 | 8.26 | 4,079,389 |

Case 2:11-bk-27518-GBN    Doc 79    Filed 01/25/12    Entered 01/25/12 15:27:43    Desc
Main Document    Page 35 of 39

# FINANCIAL PLAN SUMMARY

## *FY'13 Plan*

| Unit | Total Sales $ | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert. % | Utilities % | Other Controll. % | Unit Profit $ | Unit Profit % | Fixed & Occ. % | Operating Profit $ | Operating Profit % | Cash Flow $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306 Beeville | 276,923 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 34,892 | 12.6 | 12.1 | 1,365 | 0.5 | 6,814 |
| 423 Magnolia | 276,923 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 34,892 | 12.6 | 8.0 | 12,763 | 4.6 | 20,510 |
| 304 Tucumcari | 507,484 | 38.0 | 22.7 | 9.2 | 4.8 | 36.7 | - | 1.0 | 6.7 | 7.0 | 54,373 | 10.7 | 16.1 | (27,313) | (5.4) | (11,277) |
| 307 Lamesa | 890,777 | 40.8 | 21.6 | 5.9 | 5.2 | 32.7 | - | 1.5 | 7.4 | 7.0 | 94,259 | 10.6 | 11.3 | (6,055) | (0.7) | 16,259 |
| 308 Dumas | 1,033,097 | 36.2 | 19.9 | 6.2 | 5.0 | 31.1 | - | 4.3 | 3.4 | 7.0 | 186,424 | 18.0 | 4.2 | 142,863 | 13.8 | 170,824 |
| 341 Artesia | 1,418,298 | 41.2 | 20.3 | 4.0 | 3.9 | 28.3 | - | 0.5 | 2.7 | 7.0 | 288,483 | 20.3 | 4.6 | 223,300 | 15.7 | 271,583 |
| 342 Dalhart | 902,926 | 41.9 | 17.9 | 6.0 | 3.7 | 27.6 | - | 0.8 | 4.3 | 7.0 | 166,079 | 18.4 | 5.8 | 113,421 | 12.6 | 151,779 |
| 361 Denver | 6,759,269 | 33.2 | 24.8 | 2.7 | 4.2 | 31.8 | 3.2 | 1.0 | 5.0 | 7.0 | 1,969,222 | 29.1 | 5.2 | 1,619,072 | 24.0 | 1,727,422 |
| 376 Helena | 628,003 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.9 | 7.0 | 100,213 | 16.0 | 8.3 | 47,977 | 7.6 | 52,113 |
| 378 Vernal | 1,085,319 | 29.8 | 19.4 | 8.4 | 4.5 | 32.3 | - | 0.8 | 4.4 | 7.0 | 279,783 | 25.8 | 3.6 | 240,610 | 22.2 | 258,983 |
| 379 Richfield | 446,136 | 34.8 | 22.1 | 11.7 | 5.8 | 39.6 | - | 1.3 | 8.9 | 7.0 | 37,534 | 8.4 | 12.5 | (18,018) | (4.0) | (4,716) |
| 383 Great Falls | 1,292,086 | 33.0 | 22.3 | 7.2 | 4.9 | 34.5 | - | 1.0 | 4.6 | 7.0 | 257,199 | 19.9 | 4.6 | 197,727 | 15.3 | 229,899 |
| 384 Billings | 1,137,190 | 33.1 | 24.3 | 8.1 | 5.8 | 38.2 | - | 0.8 | 3.7 | 7.0 | 195,708 | 17.2 | 7.8 | 106,507 | 9.4 | 119,008 |
| 388 Coeur d'Alene | 669,648 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.8 | 7.0 | 107,013 | 16.0 | 14.5 | 10,025 | 1.5 | 21,213 |
| 389 Rexburg | 563,671 | 32.6 | 20.7 | 10.4 | 5.2 | 36.3 | - | 0.5 | 6.3 | 7.0 | 95,564 | 17.0 | 9.0 | 44,918 | 8.0 | 79,314 |
| 391 Miles City | 992,111 | 31.0 | 25.3 | 6.6 | 5.2 | 37.2 | - | 0.5 | 3.9 | 7.0 | 201,911 | 20.4 | 11.9 | 83,501 | 8.4 | 103,761 |
| 392 Great Falls | 648,547 | 27.9 | 23.7 | 9.0 | 5.7 | 38.4 | - | 0.5 | 6.4 | 7.0 | 128,563 | 19.8 | 7.4 | 80,492 | 12.4 | 110,363 |
| 393 Havre | 849,208 | 28.8 | 23.4 | 6.9 | 5.0 | 35.3 | - | 0.8 | 4.9 | 7.0 | 197,349 | 23.2 | 3.9 | 164,350 | 19.4 | 179,149 |
| 394 Deer Lodge | 748,564 | 32.8 | 23.5 | 7.5 | 4.7 | 37.8 | - | 0.3 | 4.9 | 7.0 | 125,048 | 16.7 | 8.7 | 59,991 | 8.0 | 81,498 |
| 395 Butte | 480,277 | 34.0 | 25.2 | 10.7 | 5.3 | 41.2 | - | 0.5 | 7.1 | 7.0 | 49,001 | 10.2 | 9.9 | 1,219 | 0.3 | 20,401 |
| 396 Polson | 1,034,104 | 30.0 | 21.8 | 6.1 | 2.9 | 30.7 | - | 0.8 | 3.8 | 7.0 | 286,732 | 27.7 | 10.7 | 176,418 | 17.1 | 215,232 |
| 397 Missoula | 1,068,559 | 30.2 | 23.2 | 7.2 | 4.4 | 34.7 | - | 0.8 | 5.0 | 7.0 | 213,713 | 20.0 | 6.9 | 139,977 | 13.1 | 143,513 |
| 422 Magee | 988,295 | 43.1 | 20.9 | 5.2 | 3.8 | 29.9 | - | 0.5 | 6.3 | 7.0 | 130,454 | 13.2 | 12.4 | 7,853 | 0.8 | 85,279 |
| 445 Titusville | 1,376,134 | 41.7 | 21.2 | 5.7 | 4.9 | 31.8 | - | 0.5 | 10.6 | 7.0 | 123,538 | 9.0 | 9.9 | (12,659) | (0.9) | 70,238 |
| 462 Plant City | 1,770,556 | 41.7 | 18.7 | 6.2 | 4.4 | 29.3 | - | 0.5 | 7.1 | 7.0 | 255,846 | 14.5 | 5.2 | 164,682 | 9.3 | 210,346 |
| 466 Ormond Beach | 551,516 | 34.0 | 23.8 | 6.3 | 5.1 | 35.2 | - | 0.5 | 9.4 | 7.0 | 76,720 | 13.9 | 15.6 | (9,486) | (1.7) | 16,920 |
| 522 Scottsdale | 1,348,059 | 40.3 | 21.0 | 5.9 | 3.5 | 30.3 | - | 0.3 | 7.6 | 7.0 | 194,580 | 14.4 | 12.1 | 31,162 | 2.3 | 110,730 |
| 533 Yuma | 1,478,020 | 36.3 | 21.5 | 7.2 | 3.7 | 32.4 | - | 0.3 | 7.3 | 7.0 | 247,628 | 16.8 | 13.2 | 53,238 | 3.6 | 150,778 |
| 551 Huntsville | 956,106 | 44.2 | 18.3 | 7.8 | 4.1 | 30.3 | - | 0.3 | 8.3 | 7.0 | 93,275 | 9.8 | 14.5 | (45,436) | (4.8) | (31,525) |
| 553 Jonesboro | 1,539,819 | 45.0 | 19.9 | 6.6 | 4.3 | 30.7 | - | 0.5 | 4.8 | 7.0 | 183,886 | 11.9 | 8.7 | 50,004 | 3.2 | 66,886 |
| 567 Tupelo | 1,425,528 | 45.6 | 18.3 | 9.1 | 4.1 | 31.5 | - | 0.5 | 5.6 | 7.0 | 139,617 | 9.8 | 9.8 | (583) | (0.0) | 13,517 |
| TOTAL | 35,143,193 | 34.5 | 21.9 | 6.3 | 4.5 | 32.7 | 0.6 | 0.8 | 5.7 | 7.0 | 6,549,499 | 18.6 | 8.2 | 3,653,687 | 10.4 | 4,656,814 |

# Star Buffet, Inc.

Case 2:11-bk-27518-GBN   Doc 79   Filed 01/25/12   Entered 01/25/12 15:27:43   Desc Main Document   Page 36 of 39

# FINANCIAL PLAN SUMMARY

## FY'14 Plan

# Star Buffet, Inc.

| Unit | Total Sales $ | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert. % | Utilities % | Other Controll. % | Unit Profit $ | Unit Profit % | Fixed & Occ. % | Operating Profit $ | Operating Profit % | Cash Flow $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306 Bristle | 600,000 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 75,600 | 12.6 | 12.1 | 3,107 | 0.5 | 18,252 |
| 423 Magnolia | 600,000 | 42.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 57,877 | 9.6 | 7.7 | 11,680 | 1.9 | 31,677 |
| 476 Sierra Vista | 276,923 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 34,892 | 12.6 | 10.6 | 5,410 | 2.0 | 18,384 |
| 304 Tucumcari | 507,484 | 38.0 | 22.7 | 9.2 | 4.8 | 36.7 | - | 1.0 | 6.7 | 7.0 | 54,373 | 10.7 | 16.4 | (28,614) | (5.6) | (11,277) |
| 307 Lamesa | 890,777 | 40.8 | 21.6 | 5.9 | 5.2 | 32.7 | - | 1.5 | 7.4 | 7.0 | 94,259 | 10.6 | 10.6 | (428) | (0.0) | 16,259 |
| 308 Dumas | 1,033,097 | 36.2 | 19.9 | 6.2 | 5.0 | 31.1 | - | 4.3 | 3.4 | 7.0 | 186,424 | 18.0 | 4.5 | 139,526 | 13.5 | 170,824 |
| 341 Artesia | 1,418,298 | 41.2 | 20.3 | 4.0 | 3.9 | 28.3 | - | 0.5 | 2.7 | 7.0 | 288,483 | 20.3 | 4.7 | 221,383 | 15.6 | 271,283 |
| 342 Dalhart | 902,926 | 41.9 | 17.9 | 6.0 | 3.7 | 27.6 | - | 0.8 | 4.3 | 7.0 | 166,079 | 18.4 | 6.0 | 111,573 | 12.4 | 151,779 |
| 361 Denver | 6,759,269 | 23.0 | 24.8 | 2.7 | 4.2 | 31.8 | 3.2 | 1.0 | 5.0 | 7.0 | 1,969,222 | 29.1 | 4.6 | 1,655,789 | 24.5 | 1,727,422 |
| 376 Helena | 628,003 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.9 | 7.0 | 100,213 | 16.0 | 8.8 | 44,640 | 7.1 | 52,113 |
| 378 Vernal | 1,085,319 | 29.8 | 19.4 | 8.4 | 4.5 | 32.3 | - | 0.8 | 4.4 | 7.0 | 279,783 | 25.8 | 3.9 | 237,419 | 21.9 | 258,983 |
| 379 Richfield | 446,136 | 34.8 | 22.1 | 11.7 | 5.8 | 39.6 | - | 1.3 | 8.9 | 7.0 | 37,534 | 8.4 | 12.7 | (19,047) | (4.3) | (4,716) |
| 383 Great Falls | 1,292,086 | 32.5 | 22.3 | 7.2 | 4.9 | 34.5 | - | 1.0 | 4.6 | 7.0 | 263,945 | 20.4 | 4.7 | 203,440 | 15.7 | 236,545 |
| 384 Billings | 1,137,190 | 33.1 | 24.3 | 8.1 | 5.8 | 38.2 | - | 0.8 | 3.7 | 7.0 | 195,708 | 17.2 | 8.1 | 163,693 | 9.1 | 119,008 |
| 388 Coeur d'Alene | 669,648 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.8 | 7.0 | 107,013 | 16.0 | 15.0 | 6,688 | 1.0 | 21,213 |
| 389 Rexburg | 563,671 | 32.6 | 20.7 | 10.4 | 5.2 | 36.3 | - | 0.8 | 6.3 | 7.0 | 95,564 | 17.0 | 9.5 | 42,211 | 7.5 | 79,314 |
| 391 Miles City | 992,111 | 31.0 | 25.3 | 6.6 | 5.2 | 37.2 | - | 0.5 | 3.9 | 7.0 | 201,911 | 20.4 | 12.0 | 83,296 | 8.4 | 103,761 |
| 392 Great Falls | 648,547 | 27.9 | 23.7 | 9.0 | 5.7 | 38.4 | - | 0.5 | 6.4 | 7.0 | 128,563 | 19.8 | 7.7 | 78,327 | 12.1 | 110,363 |
| 393 Havre | 849,208 | 28.8 | 23.4 | 6.9 | 5.0 | 33.3 | - | 0.8 | 4.9 | 7.0 | 197,349 | 23.2 | 4.2 | 161,612 | 19.0 | 179,149 |
| 394 Deer Lodge | 748,564 | 32.8 | 25.5 | 7.5 | 4.7 | 37.8 | - | 0.8 | 4.9 | 7.0 | 125,048 | 16.7 | 8.6 | 60,668 | 8.1 | 81,498 |
| 395 Butte | 480,277 | 34.0 | 25.2 | 10.7 | 5.3 | 41.2 | - | 0.5 | 7.1 | 7.0 | 49,001 | 10.2 | 10.6 | (2,118) | (0.4) | 20,401 |
| 396 Polson | 1,034,104 | 30.0 | 21.8 | 6.1 | 2.9 | 30.7 | - | 0.8 | 3.8 | 7.0 | 286,732 | 27.7 | 8.9 | 195,014 | 18.9 | 215,252 |
| 397 Missoula | 1,068,559 | 32.6 | 23.2 | 7.2 | 4.4 | 34.7 | - | 0.8 | 5.0 | 7.0 | 213,713 | 20.0 | 7.2 | 136,640 | 12.8 | 143,513 |
| 422 Magee | 988,293 | 43.1 | 20.9 | 5.2 | 3.8 | 29.9 | - | 0.5 | 6.3 | 7.0 | 130,454 | 13.2 | 12.7 | 4,516 | 0.5 | 85,279 |
| 445 Titusville | 1,376,134 | 41.2 | 21.2 | 5.7 | 4.9 | 31.8 | - | 0.5 | 10.6 | 7.0 | 123,538 | 9.0 | 10.1 | (15,996) | (1.2) | 70,238 |
| 462 River City | 1,770,536 | 41.7 | 18.7 | 6.2 | 4.4 | 29.3 | - | 0.5 | 7.1 | 7.0 | 255,846 | 14.5 | 5.1 | 166,318 | 9.4 | 210,346 |
| 466 Ormond Beach | 551,516 | 34.0 | 23.8 | 6.3 | 5.1 | 35.2 | - | 0.5 | 9.4 | 7.0 | 76,720 | 13.9 | 16.2 | (12,706) | (2.3) | 16,920 |
| 522 Scottsdale | 1,348,059 | 40.3 | 21.0 | 5.9 | 3.5 | 30.3 | - | 0.3 | 7.6 | 7.0 | 194,580 | 14.4 | 11.8 | 35,855 | 2.7 | 110,730 |
| 533 Yuma | 1,478,020 | 36.3 | 21.5 | 7.2 | 3.7 | 32.4 | - | 0.3 | 7.3 | 7.0 | 247,628 | 16.8 | 13.3 | 50,832 | 3.4 | 150,778 |
| 551 Huntsville | 956,106 | 44.2 | 18.3 | 7.8 | 4.1 | 30.3 | - | 0.5 | 8.3 | 7.0 | 93,275 | 9.8 | 15.3 | (52,807) | (5.5) | (31,525) |
| 553 Jonesboro | 1,539,879 | 45.0 | 19.9 | 6.6 | 4.3 | 30.7 | - | 0.5 | 4.8 | 7.0 | 183,886 | 11.9 | 8.9 | 46,667 | 3.0 | 66,886 |
| 567 Tupelo | 1,425,528 | 45.6 | 18.3 | 9.1 | 4.1 | 31.5 | - | 0.5 | 5.6 | 7.0 | 139,617 | 9.8 | 10.1 | (4,091) | (0.3) | 13,517 |
| TOTAL | 36,066,270 | 34.7 | 21.9 | 6.3 | 4.5 | 32.7 | 0.6 | 0.8 | 5.8 | 7.0 | 6,654,730 | 18.5 | 8.3 | 3,670,596 | 10.2 | 4,704,449 |

-15 D-

# FINANCIAL PLAN SUMMARY

## _FY'15 Plan_

| Unit | Total Sales | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert % | Utilities % | Other Controll % | Unit Profit $ | Unit Profit % | Fixed & Occ % | Operating Profit $ | Operating Profit % | Cash Flow $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306 Beeville | 600,000 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 75,600 | 12.6 | 12.1 | 3,171 | 0.5 | 18,252 |
| 423 Magnolia | 600,000 | 41.2 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 64,800 | 10.8 | 8.1 | 16,001 | 2.7 | 38,600 |
| 478 Sierra Vista | 600,000 | 41.2 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 64,800 | 10.8 | 8.4 | 14,419 | 2.4 | 44,700 |
| 304 Tucumcari | 507,484 | 38.0 | 22.7 | 7.5 | 4.8 | 35.0 | - | 1.0 | 6.7 | 7.0 | 62,606 | 12.3 | 17.7 | (25,988) | (5.3) | (3,044) |
| 307 Lamesa | 880,777 | 40.8 | 21.6 | 5.9 | 5.2 | 32.7 | - | 1.5 | 7.4 | 7.0 | 94,259 | 10.6 | 10.6 | (569) | (0.1) | 18,259 |
| 308 Dumas | 1,033,097 | 38.2 | 19.9 | 6.2 | 5.0 | 31.1 | - | 4.3 | 3.4 | 7.0 | 186,424 | 18.0 | 4.1 | 143,616 | 13.9 | 170,624 |
| 341 Artesia | 1,418,298 | 41.2 | 20.3 | 4.0 | 3.9 | 28.3 | - | 0.5 | 2.7 | 7.0 | 288,483 | 20.3 | 4.0 | 231,380 | 16.3 | 271,853 |
| 342 Dalhart | 902,926 | 41.9 | 17.9 | 6.0 | 3.7 | 27.6 | - | 0.8 | 4.3 | 7.0 | 166,079 | 18.4 | 6.3 | 109,085 | 12.1 | 151,779 |
| 361 Denver | 6,759,269 | 23.0 | 24.8 | 2.7 | 4.2 | 31.8 | 3.2 | 1.0 | 5.0 | 7.0 | 1,969,222 | 29.1 | 4.3 | 1,676,477 | 24.8 | 1,727,422 |
| 376 Helena | 628,003 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.9 | 7.0 | 100,213 | 16.0 | 9.4 | 41,202 | 6.6 | 52,113 |
| 378 Vernal | 1,085,319 | 29.8 | 19.4 | 8.4 | 4.5 | 32.3 | - | 0.8 | 4.4 | 7.0 | 279,783 | 25.8 | 4.1 | 235,295 | 21.7 | 258,983 |
| 379 Richfield | 446,136 | 34.8 | 22.1 | 10.3 | 5.8 | 38.2 | - | 1.3 | 8.9 | 7.0 | 43,573 | 9.8 | 12.9 | (13,602) | (3.1) | 1,323 |
| 388 Great Falls | 1,292,096 | 32.5 | 22.3 | 7.2 | 4.9 | 34.5 | - | 1.0 | 4.6 | 7.0 | 263,845 | 20.4 | 4.8 | 202,348 | 15.7 | 235,545 |
| 384 Billings | 1,137,190 | 33.1 | 24.3 | 8.1 | 5.8 | 38.2 | - | 0.8 | 3.7 | 7.0 | 195,708 | 17.2 | 8.3 | 101,055 | 8.9 | 119,008 |
| 389 Coeur d'Alene | 669,648 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.8 | 7.0 | 107,013 | 16.0 | 15.5 | 3,250 | 0.5 | 21,213 |
| 389 Rexburg | 563,671 | 32.6 | 20.7 | 10.4 | 5.2 | 36.3 | - | 0.5 | 6.3 | 7.0 | 95,564 | 17.0 | 9.9 | 39,640 | 7.0 | 79,314 |
| 391 Miles City | 992,111 | 31.0 | 25.3 | 6.6 | 5.2 | 37.2 | - | 0.5 | 3.9 | 7.0 | 201,911 | 20.4 | 12.2 | 81,096 | 8.2 | 103,761 |
| 392 Great Falls | 848,547 | 27.9 | 23.7 | 9.0 | 5.7 | 38.4 | - | 0.5 | 6.4 | 7.0 | 168,563 | 19.8 | 8.1 | 76,040 | 11.7 | 110,363 |
| 393 Havre | 849,208 | 28.8 | 23.4 | 6.9 | 5.0 | 35.3 | - | 0.8 | 4.9 | 7.0 | 197,349 | 23.2 | 4.3 | 160,730 | 18.9 | 173,149 |
| 394 Deer Lodge | 748,564 | 32.8 | 26.5 | 7.5 | 4.7 | 37.8 | - | 0.5 | 4.9 | 7.0 | 125,048 | 16.7 | 8.4 | 61,986 | 8.3 | 81,498 |
| 395 Butte | 480,277 | 34.0 | 25.2 | 10.7 | 5.3 | 41.2 | - | 0.5 | 7.1 | 7.0 | 49,001 | 10.2 | 9.4 | 3,649 | 0.8 | 20,401 |
| 398 Polson | 1,034,104 | 30.0 | 21.8 | 6.1 | 2.9 | 30.7 | - | 0.8 | 3.8 | 7.0 | 286,732 | 27.7 | 8.5 | 198,740 | 19.2 | 255,232 |
| 397 Missoula | 1,068,559 | 32.6 | 23.2 | 7.2 | 4.4 | 34.7 | - | 0.8 | 5.0 | 7.0 | 213,713 | 20.0 | 7.5 | 133,203 | 12.5 | 143,513 |
| 422 Magee | 968,283 | 43.1 | 20.9 | 5.2 | 3.8 | 29.9 | - | 0.3 | 6.3 | 7.0 | 130,454 | 13.2 | 13.0 | 1,633 | 0.2 | 85,279 |
| 445 Titusville | 1,376,134 | 41.7 | 21.2 | 5.7 | 4.9 | 31.8 | - | 0.5 | 10.6 | 7.0 | 123,538 | 9.0 | 8.7 | 3,919 | 0.3 | 70,238 |
| 466 Plant City | 1,770,536 | 41.7 | 18.7 | 6.2 | 4.4 | 29.3 | - | 0.5 | 7.1 | 7.0 | 255,846 | 14.5 | 5.0 | 167,931 | 9.5 | 210,946 |
| 466 Ormond Beach | 551,516 | 34.0 | 23.8 | 6.3 | 5.1 | 35.2 | - | 0.5 | 9.4 | 7.0 | 76,720 | 13.9 | 16.6 | (14,763) | (2.7) | 16,920 |
| 522 Scottsdale | 1,348,059 | 40.3 | 21.0 | 5.9 | 3.5 | 30.3 | - | 0.3 | 7.6 | 7.0 | 194,580 | 14.4 | 10.0 | 59,670 | 4.4 | 190,730 |
| 533 Yuma | 1,478,020 | 36.3 | 21.5 | 7.2 | 3.7 | 32.4 | - | 0.3 | 7.3 | 7.0 | 247,620 | 16.8 | 12.9 | 56,325 | 3.8 | 190,778 |
| 551 Huntsville | 956,106 | 43.8 | 18.0 | 6.8 | 4.1 | 28.9 | - | 0.5 | 7.3 | 7.0 | 119,053 | 12.5 | 15.1 | (25,448) | (2.7) | (5,737) |
| 553 Jonesboro | 1,539,879 | 45.0 | 19.9 | 5.8 | 4.3 | 30.0 | - | 0.5 | 4.8 | 7.0 | 194,792 | 12.6 | 8.9 | 58,271 | 3.8 | 77,792 |
| 567 Tupelo | 1,425,523 | 45.6 | 18.3 | 9.1 | 4.1 | 31.5 | - | 0.5 | 5.6 | 7.0 | 139,617 | 9.8 | 10.3 | (7,909) | (0.6) | 13,517 |
| **TOTAL** | 36,388,347 | 34.7 | 21.9 | 6.2 | 4.5 | 32.6 | 0.6 | 0.8 | 5.8 | 7.0 | 6,742,527 | 18.5 | 8.1 | 3,790,864 | 10.4 | 4,788,654 |

# Star Buffet, Inc.

-15 E-

# FINANCIAL PLAN SUMMARY

## FY'16 Plan

| Unit | Total Sales $ | Food % | Hourly % | Mgmt % | Benefits % | Labor % | Entertain % | Advert. % | Utilities % | Other Controll. % | Unit Profit $ | Unit Profit % | Fixed & Occ. % | Operating Profit $ | Operating Profit % | Cash Flow $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 306 Beeville | 600,000 | 39.4 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 75,600 | 12.6 | 12.3 | 1,570 | 0.3 | 18,252 |
| 423 Magnolia | 600,000 | 41.2 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 64,800 | 10.8 | 9.8 | 6,282 | 1.0 | 38,600 |
| 476 Sierra Vista | 600,000 | 41.2 | 22.0 | 6.0 | 5.0 | 33.0 | - | 1.0 | 7.0 | 7.0 | 64,800 | 10.8 | 8.4 | 14,161 | 2.4 | 44,700 |
| 304 Tucumcari | 507,464 | 38.2 | 22.7 | 7.5 | 4.8 | 35.0 | - | 1.0 | 6.7 | 6.7 | 63,026 | 12.4 | 16.6 | (21,272) | (4.2) | (2,624) |
| 307 Lamesa | 890,777 | 40.8 | 21.6 | 5.9 | 5.2 | 32.7 | - | 1.5 | 7.4 | 6.7 | 96,753 | 10.9 | 10.9 | (671) | (0.1) | 18,753 |
| 308 Dumas | 1,033,097 | 36.2 | 19.9 | 6.2 | 5.0 | 31.1 | - | 4.3 | 3.4 | 6.7 | 189,317 | 18.3 | 4.3 | 144,906 | 14.0 | 173,717 |
| 341 Artesia | 1,418,286 | 41.2 | 20.3 | 4.0 | 3.9 | 28.3 | - | 0.5 | 2.7 | 6.7 | 292,454 | 20.6 | 3.5 | 242,830 | 17.1 | 275,554 |
| 342 Dalhart | 902,926 | 41.9 | 17.9 | 6.0 | 3.7 | 27.6 | - | 0.8 | 4.3 | 6.7 | 168,607 | 18.7 | 5.1 | 122,575 | 13.6 | 154,307 |
| 361 Demer | 6,759,269 | 23.0 | 24.8 | 2.7 | 4.2 | 31.8 | 3.2 | 1.0 | 5.0 | 6.7 | 1,988,148 | 29.4 | 4.1 | 1,710,400 | 25.3 | 1,746,348 |
| 376 Helena | 628,003 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.9 | 6.7 | 101,971 | 16.2 | 9.9 | 39,523 | 6.3 | 53,871 |
| 378 Vernal | 1,085,319 | 29.8 | 19.4 | 8.4 | 4.5 | 32.3 | - | 0.8 | 4.4 | 6.7 | 282,821 | 26.1 | 4.3 | 236,392 | 21.8 | 262,021 |
| 379 Richfield | -446,136 | 34.8 | 22.1 | 10.3 | 5.8 | 38.2 | - | 1.3 | 8.9 | 6.7 | 44,822 | 10.0 | 13.0 | (13,196) | (3.0) | 2,572 |
| 383 Great Falls | 1,292,086 | 32.5 | 22.3 | 7.2 | 4.9 | 34.5 | - | 1.0 | 4.6 | 6.7 | 267,463 | 20.7 | 4.7 | 206,254 | 16.0 | 240,163 |
| 384 Billings | 1,137,190 | 33.1 | 24.3 | 8.1 | 5.8 | 38.2 | - | 0.8 | 3.7 | 6.7 | 198,892 | 17.5 | 8.5 | 102,796 | 9.0 | 122,192 |
| 388 Coeur d'Alene | 669,648 | 33.2 | 20.5 | 10.5 | 5.2 | 36.2 | - | 0.8 | 6.8 | 6.7 | 108,886 | 16.3 | 16.0 | 1,588 | 0.3 | 23,088 |
| 389 Rexburg | 563,671 | 32.6 | 20.7 | 10.4 | 5.2 | 36.3 | - | 0.8 | 6.3 | 6.7 | 97,142 | 17.2 | 8.6 | 48,430 | 8.6 | 80,892 |
| 391 Miles City | 992,111 | 31.0 | 25.3 | 6.6 | 5.2 | 37.2 | - | 0.5 | 3.9 | 6.7 | 204,689 | 20.6 | 12.3 | 82,934 | 8.4 | 106,539 |
| 392 Great Falls | 648,547 | 27.9 | 23.7 | 9.0 | 5.7 | 38.4 | - | 0.5 | 6.4 | 6.7 | 130,379 | 20.1 | 8.1 | 77,562 | 12.0 | 112,179 |
| 393 Havre | 849,208 | 28.8 | 23.4 | 6.9 | 5.0 | 35.3 | - | 0.5 | 4.9 | 6.7 | 169,727 | 23.5 | 4.3 | 162,852 | 19.2 | 181,527 |
| 394 Deer Lodge | 748,564 | 32.8 | 25.5 | 7.5 | 4.7 | 37.8 | - | 0.8 | 4.9 | 6.7 | 127,144 | 17.0 | 8.5 | 63,847 | 8.5 | 83,594 |
| 395 Butte | 480,277 | 34.0 | 25.2 | 10.7 | 5.3 | 41.2 | - | 0.8 | 7.1 | 6.7 | 50,346 | 10.5 | 9.0 | 7,128 | 1.5 | 21,746 |
| 396 Poison | 1,034,104 | 30.0 | 21.8 | 6.1 | 2.9 | 30.7 | - | 0.8 | 3.8 | 6.7 | 289,627 | 28.0 | 8.4 | 202,386 | 19.6 | 218,127 |
| 397 Missoula | 1,068,559 | 32.6 | 23.2 | 7.2 | 4.4 | 34.7 | - | 0.5 | 5.0 | 6.7 | 216,706 | 20.3 | 7.8 | 132,831 | 12.4 | 146,505 |
| 422 Magee | 988,293 | 43.1 | 20.9 | 5.2 | 3.8 | 29.9 | - | 0.5 | 6.3 | 6.7 | 133,221 | 13.5 | 8.2 | 51,624 | 5.2 | 88,046 |
| 445 Titusville | 1,376,134 | 41.2 | 21.2 | 5.7 | 4.9 | 31.8 | - | 0.5 | 10.6 | 6.7 | 127,391 | 9.3 | 6.6 | 36,257 | 2.6 | 74,091 |
| 462 Plant City | 1,770,536 | 41.7 | 18.7 | 6.2 | 4.4 | 29.3 | - | 0.5 | 7.1 | 6.7 | 260,803 | 14.7 | 5.0 | 172,088 | 9.7 | 215,303 |
| 466 Ormond Beach | 551,516 | 34.0 | 23.8 | 6.3 | 5.1 | 35.2 | - | 0.5 | 9.4 | 6.7 | 78,264 | 14.2 | 14.7 | (2,866) | (0.5) | 18,464 |
| 522 Scottsdale | 1,348,059 | 40.3 | 21.0 | 5.9 | 3.5 | 36.2 | - | 0.3 | 7.6 | 6.7 | 198,354 | 14.7 | 9.8 | 66,502 | 4.9 | 114,504 |
| 533 Yuma | 1,478,020 | 36.3 | 21.5 | 7.2 | 3.7 | 32.4 | - | 0.3 | 7.3 | 6.7 | 251,767 | 17.0 | 11.0 | 89,775 | 6.1 | 154,917 |
| 551 Huntsville | 956,106 | 43.8 | 18.0 | 6.8 | 4.1 | 28.9 | - | 0.5 | 7.3 | 6.7 | 121,740 | 12.7 | 15.3 | (24,281) | (2.5) | (3,060) |
| 553 Jonesboro | 1,539,879 | 45.0 | 19.9 | 5.8 | 4.3 | 30.0 | - | 0.5 | 4.8 | 6.7 | 199,103 | 12.9 | 8.5 | 68,459 | 4.4 | 82,103 |
| 567 Tupelo | 1,425,526 | 45.6 | 18.3 | 9.1 | 4.1 | 31.5 | - | 0.5 | 5.6 | 6.7 | 143,699 | 10.1 | 10.5 | (5,767) | (0.4) | 17,509 |
| TOTAL | 36,389,347 | 34.7 | 21.9 | 6.2 | 4.5 | 32.6 | 0.6 | 0.8 | 5.8 | 6.7 | 6,838,377 | 18.8 | 7.7 | 4,024,301 | 11.1 | 4,684,504 |

**Star Buffet, Inc.**

Case 2:11-bk-27518-GBN   Doc 79   Filed 01/25/12   Entered 01/25/12 15:27:43   Desc
Main Document   Page 39 of 39