Richard M. Lorenzen, Bar No. 006787
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
RLorenzen@perkinscoie.com
Telephone: 602.351.8000
Facsimile: 602.648.7000

Schuyler G. Carroll, NY Bar No. 2511707
*(Admitted Pro Hac Vice)*
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
SCarroll@perkinscoie.com
Telephone: 212.262.6905
Facsimile: 212.977.1636

*Attorneys for* the Official Joint Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>STAR BUFFET, INC.,<br><br>                Debtor.<br><br>In re:<br><br>SUMMIT FAMILY RESTAURANTS, INC.,<br><br>                Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case No. 2:11-bk-27518-GBN and<br>Case No. 2:11-bk-27713-GBN<br><br>**DECLARATION OF FRED KING IN SUPPORT OF THE AMENDED FIRST AND FINAL FEE APPLICATIONS OF PERKINS COIE LLP AND CORPORATE RECOVERY ASSOCIATES**<br><br>Hearing Date: July 9, 2013<br>Hearing Time: 1:30 p.m.<br>Place:       Courtroom 702<br>                230 N. First Avenue<br>                Phoenix, Arizona |

I, Fred King, declare as follows:

I am an attorney and I, throughout these Chapter 11 cases, represented K & A Brasher, LLC, as a member of the Official Joint Committee of Unsecured Creditors of Star Buffet, Inc. and Summit Family Restaurants, Inc. (the "Committee"). This declaration is made in support of the Amended First and Final Fee Application of Perkins Coie LLP and the First and Final Fee Application of Corporate Recovery Associates seeking entry of an Order Awarding Fees and Expenses.

It is shocking to me that the Debtors would object to the fees incurred by the Committee professionals. The work done by the Committee professionals was all undertaken at the direction of the Committee members and resulted in direct and measurable benefit to the unsecured creditors. Moreover, actions taken by the Committee professionals were reasonable and appropriate. Any complaint about the amount of fees incurred should be directed squarely at the Debtors, as it was their own conduct that forced the Committee professionals to take the actions they did.

I have reviewed the bills from Corporate Recovery Associates and Perkins Coie LLP and believe they are reasonable.

In addition under the original plan, unsecured creditors would have waited for approximately seven years after filing bankruptcy until they would be paid in full—and that assumes that everything goes smoothly, the Debtors never have a problem, they never miss a payment, their operations always make projections and their real estate sells for at least the projected amounts. These are big assumptions for a very long time period. As a result, the Committee members were not comfortable waiting that long and directed their professionals

to develop a strategy that would ensure sooner recovery, with fewer assumptions.

A little background will be helpful to fully understand why the Committee professionals took the actions they did. Many of the Committee members had dealt with the Debtors for many years. Based on their experience, the Committee members believed the Debtors had a history of evasive behavior whenever confronted with financial obligations. The Committee members were very concerned that the Debtors would use the Chapter 11 process to provide them further delay and then exit bankruptcy without any protections for creditors.

The Committee members' experiences were similar—the Debtors consistently did everything possible to avoid making payments to the Committee members and other creditors. Indeed, several of the Committee members had seen the Debtors transfer assets to newly created entities during litigation and even after creditors obtained judgments, solely in an effort to frustrate the efforts of creditors to collect on their unpaid debts. This was not an isolated incident, but rather a pattern that occurred repeatedly, which ultimately resulted in the Debtors' Chapter 11 filings.

Prior to the employment of Perkins Coie and Corporate Recovery Associates, Debtors filed a plan, which allegedly provided for payment in full to all creditors, but even without the assistance of counsel, the Committee members could see there were many loopholes and problems with the plan that would allow the Debtors to further string out creditors. As a starting point, the plan provided that no payments at all would be made to unsecured creditors until more than 5 years later—and that would only be if everything went perfectly and there was no default during that time.

The plan also had several problems that would permit the Debtors to continue their pattern of evasion. For example, the plan provided that any sale of real estate would result in payments to creditors (first to all other creditors—including Robert Wheaton—before anything would be paid to unsecured creditors). In reality, however, the plan allowed the Debtors to continue their pattern of evasion, while at the same time creating the impression that creditors would be paid in full. In this regard, the Debtors are holding companies that do not own any real estate. Thus, the plan provisions were not binding on any entity that owns real estate and the plan provisions were entirely ineffective to grant any protections—even though on its face the provisions seem to benefit creditors.

As a result of tricks like these that were contained in the plan, once the Debtors obtained approval of their disclosure statement, the Committee became even more concerned that the rights of creditors would be destroyed if the Debtors were allowed to continue their Chapter 11 process without any check—in the form of an effective creditors committee. The Committee members also realized that without the assistance of able counsel, they could not satisfy their fiduciary duties to other unsecured creditors, let alone stop the Debtors from taking advantage of creditors.

It is also ironic that the Debtors have characterized this as a simple case. Nothing could be further from the truth—and the Debtors actions made this even more complex. For example, one of the Debtors, Star Buffet, Inc., is a public company with millions of shares outstanding. The other Debtor was described as a company that no longer operates. The overall structure, however, includes nearly 25 wholly owned subsidiaries and affiliates, with

more than 50 restaurant locations and nearly 2,000 employees.

Unfortunately, until about May of 2012, the Committee had not been able to find professionals to represent its interests without a guarantee of payment (from the Committee members), or alternatively a retainer. Until that time, the Committee primarily attempted to find counsel located in the Phoenix area. Many of the lawyers contacted by Committee members were conflicted or already representing another party in the cases. At the end of May or the beginning of June 2012, the Committee members' search expanded to outside of the local market and the Committee was able to identify several attorneys and financial advisors who were not conflicted and who would be willing to assist the Committee, without guarantee of payment. The Committee interviewed several firms and then conducted a telephonic meeting on June 5, 2012, in which it unanimously voted to hire Perkins Coie and Corporate Recovery Associates.

The Committee members were particularly pleased that Perkins Coie and Corporate Recovery Associates were willing to assist because of their substantial experience in bankruptcy cases of restaurant chains. Indeed, from the Committee's discussions with Mr. Feferman and Mr. Carroll it became clear that they truly understood the restaurant industry and the issues involved in a restaurant chain chapter 11 and that they had substantial experience representing creditors committees. Mr. Carroll also explained that Perkins Coie had an office in Phoenix; however, he did point out that Mr. Lorenzen, his bankruptcy partner in Phoenix, might not have enough time to lead the engagement since he was quite busy on other matters. Because of Mr. Carroll's extensive experience in the industry and in representing creditors committees, the Committee members wanted to make sure that Mr.

Carroll led the engagement. Similarly, Mr. Feferman had extensive experience with both multi-unit restaurant chains, and both Mr. Carroll and Mr. Feferman had a history of improving the treatment of creditors in cases where an owner manager initially proposes a plan that is not satisfactory to creditors.

I understand that the Debtors are complaining that the rates charged by Mr. Carroll and Mr. Feferman are too high. Based on the professionals the Committee interviewed, however, we believe the rates are reasonable. In fact, the rates are lower than those requested by several other professionals.

As discussed above, the Committee had a very difficult time obtaining counsel and a financial advisor, particularly in the Phoenix area. Numerous firms were already involved in the case and several firms advised that they could not become involved because of conflicts. What we ultimately learned is that because Wells Fargo was a secured creditor, most firms would not be able to assist the Committee. Any local firm we could find that was able to represent the Committee would only do so if the Committee members paid a substantial retainer and agreed to pay the professional fees incurred. Since the Bankruptcy Code requires the Debtors to pay the fees, we did not believe it was appropriate for those firms to demand otherwise—and it made us uncomfortable that we might not get proper advice from such firms. In addition, while the Debtors' Chapter 11 cases were filed in Phoenix, most of the Debtors' operations are not located in Phoenix. Rather, their restaurants are spread

across many states, the Debtors' CFO works primarily in Florida and the Committee members were spread across many states.

More importantly, however, while there undoubtedly are many excellent lawyers and financial advisors in Phoenix, based on our interviews of potential professionals, it became clear to us that the old saying "You get what you pay for" was true. In particular, among the benefits of selecting Mr. Carroll and Mr. Feferman was that they each had a great deal of experience in the restaurant industry, particularly in working with similar chains. For example, they recently worked together representing the creditors committee in the chapter 11 of McGrath's Seafood, a chain of similar restaurants. In addition, Mr. Carroll described his experience representing the creditors committee of numerous other chain restaurant chapter 11 cases, including Apple Capitol, Sybra, Inc., ICH Corporation and Planet Hollywood. Mr. Feferman described his experience advising and sitting on creditors' committees in numerous other restaurant cases including Boston West, LLC; Perkins Marie Callender's, Inc.; Steakhouse Partners, Inc.; and McGrath's Publick Fish House, Inc. Mr. Feferman further explained his experience in over 30 chapter 11 cases (as a post-confirmation fiduciary, committee advisor, advisor secured creditors, and post petition investors). Mr. Feferman also expanded on his experience with difficult Debtors attempting to transfer value to themselves at the expense of unsecured creditors. Mr. Carroll also explained his experience in representing over 50 creditors committees for nearly two decades. Mr. Carroll and Mr. Feferman explained that they would be able to handle this

work primarily by themselves, without the need for teams of associates. Based on a review of their fee applications, it is clear this is exactly what they did and as a result the fees incurred are reasonable.

Again as discussed herein, when the Committee interviewed Perkins Coie, we spoke with Mr. Carroll and although he explained that he had a Phoenix office and a very good bankruptcy partner in that office, when we hired Perkins Coie, we made very clear that we expected Mr. Carroll to handle the work and not to hand us off to his partner or anyone else in the firm. Of course, we realized that New York lawyers charge more, but we believed that we needed counsel very experienced in representing creditors committees and the Debtors.

When the Committee interviewed Corporate Recovery Associates, we spoke with Mr. Feferman and he explained that he has exceptional bankruptcy analysts on his staff at lower rates. When we hired Mr. Feferman we made it clear that we expected him to personally handle the Committee's work and not to assign it to others on his staff. The Committee was aware of Mr. Feferman's hourly rates and extensive experience in working with uncooperative debtors attempting to transfer value to themselves at the expense of unsecured creditors.

Throughout these Chapter 11 cases, Mr. Carroll and Mr. Feferman's combined experience clearly resulted in many cost savings simply because they understood the issues

involved and did not need to research every detail or ask teams of associates or junior analysts to help them. For example, when Mr. Carroll reviewed the original plan, he very quickly pointed out numerous problems with the plan—including that the Debtors do not own any real estate, so that the purported lien they were granting provided no protection for the unsecured creditors and that the Debtors were not prohibited from paying huge bonuses to Mr. Wheaton, to ensure they had no free cash available to pay unsecured creditors. Without the cooperation of the Debtors, Mr. Feferman was able to zero in on potential fraudulent transfers to Mr. Wheaton and problems with the Debtors' accounting systems and controls. And as information dribbled in from the Debtors, Mr. Feferman identified inconsistencies between the Debtors' various financial reports that resulted in the issuance of a revised business plan from the Debtor, which ended the Committee's objection to the issue of feasibility.

The Committee was very concerned that the Debtors financial projections were not reasonable and that if the Debtors did not meet those projections, unsecured creditors were almost guaranteed to never receive any payment at all, let alone payment in full. The Committee instructed the principal of Corporate Recovery Associates, Richard Feferman, to familiarize himself with the Debtors, including the Debtors' (and the Debtors' subsidiaries and affiliates') assets, business operations, cash flow, prospective avoidable transfers, and alternatives for repayment to creditors. Mr. Feferman was also instructed to be at the Debtors' headquarters as soon as possible and to use his best efforts to constructively work with management in order to facilitate the Committee's efforts.

From the beginning, the Committee was frustrated by the Debtors' refusal to cooperate with Corporate Recovery Associates by avoiding providing any genuine back-up information to support the Debtors' plan. Among other things, the Debtors provided information in formats difficult to use (for example, financial information only in PDF when requested in Excel usable formats), providing inaccurate information, management's refusal to meet with Corporate Recovery Associates to facilitate the Committee's understanding of the Debtors' business operations and capacity to pay its' obligations, and ultimately insisting that instead of working with management Corporate Recovery Associates should only work through a third party (Sierra Consulting Group) who had no prior involvement, experience, or knowledge with the Debtors' financial affairs. Indeed, Sierra was not hired until after Corporate Recovery Associates began its work. Of course, this made the Committee even more skeptical of the Debtors.

On June 14, 2012, I participated in a conference call between the Committee and representatives of the Debtor. On that call, a man identifying himself as Cary Forrester and as counsel to the Debtors represented that the Debtors were willing to cooperate with the Committee by providing information and assisting with its anticipated inquiries. Unfortunately, however, this cooperation never materialized. To the contrary, the Debtors did everything possible to create obstacles.

On June 19, 2012, it was reported to me that Messer's Feferman and Carroll conducted a teleconference (one of many communications with the Debtors' representatives regarding the topic) requesting help in coordinating a site visit to the Debtors' headquarters to meet with management in the hope of fostering an ongoing working relationship focused

on reaching a consensual plan of reorganization.

On June 19, 2012, it was reported to me that Mr. Forrester communicated to the Committees' professionals that Mr. Wheaton and Mr. Dowdy would not be able to meet with Mr. Feferman in person, but suggested a conference call between Wheaton, Dowdy, Feferman, and Mr. Ted Burr of Sierra—the Debtors' new financial advisor who was just being engaged and was not familiar with the Debtors. In fact, Mr. Forrester said that this would be an ideal opportunity for Mr. Feferman because Mr. Burr had not yet started work, knew nothing about the Debtors and this call already had been scheduled specifically so that Wheaton and Dowdy could spend time with Mr. Burr and familiarize Mr. Burr with the Debtors' operation and finances. Mr. Wheaton repeatedly threatened to hang up almost every time Mr. Feferman asked a question and as a result, the call left the Committee feeling even less comfortable with the Debtors and the Committee firmly believed the Committee professionals should dig in as deep as necessary to ensure that creditors would be paid. At about this time, the Committee—as a result of Mr. Feferman's work—discovered almost $2,000,000.00 in cash that appeared to have been transferred to the Debtors' majority shareholder (Robert Wheaton) while the Debtors were insolvent.

The Debtors provided hollow promises of cooperation to meet and provide information to Mr. Feferman, but on June 22, 2012, I received a report from Mr. Feferman that the Debtors are refusing to meet with him because they are overburdened, particularly in complying with discovery requests from another creditor (Mr. Tinsley). Mr. Feferman also reported that he offered to assist in obtaining an extension for the discovery requests that the Debtors were complaining about, so that they could meet with him; but he was turned down

and refused. Mr. Feferman also advised that the Debtors were also concerned cooperating with the committee may cause the Debtors to be in violation of SEC and Sarbanes Oxley requirements, which is ironic given the Debtors' serious delinquencies in its SEC filing requirements.

On July 17, 2012, Mr. Feferman reported that after over a month of attempting to obtain information, the Debtors' representatives promised him by the weekend:

--Detailed annual P&L for all 31 locations for the last 5 years;

--Monthly data on sales and operating expenses for the same stores (should tie to the annual data);

--A spreadsheet on how the 2013 budget was calculated per store (ties to the annual data for 2011 and 2012 with the assumptions for 2013);

--A rollup schedule for all stores (from the 31 individual budgets) as well as corporate overhead which basically makes up the 2013 budget;

--Detail on the corporate / SG&A expenses including credits for what is allocated to each store (basically things like legal fees, property insurance, etc.);

--Detail on the cap ex budgets; and

--A listing of all of the store list for sale as well as the listing price.

Also on July 17, 2013, Mr. Feferman reported that he made a follow-up request of the Debtors' financial advisor:

From e-mail to Ted Burr dated July 17, 2013:

"I am so sorry to bother you, but I am writing to see if you have made any progress on getting the restaurant level P&Ls in an excel format? Also will you please send me an example of the other reports that are generated in the ordinary course of business? What kind of reporting is made to Wells Fargo?"

Two months later on September 17, 2012, Mr. Burr seems to have forgotten the earlier request:

From e-mail to Ted Burr dated September 17, 2013:
"Cc: Burr Ted <tedburr@cox.net>, Cary Forrester <SCF@forresterandworth.com>, 'Schuyler Carroll G.' <SCarroll@perkinscoie.com>, 'Lorenzen Richard M.' RLorenzen@perkinscoie.com

> From: Richard Feferman <richard.feferman@gmail.com>
> Subject: Re: Star Buffet
> Date: Sun, 16 Sep 2012 20:21:23 -0700
> To: "richard.feferman" <richard.feferman@gmail.com>
>
> Ted, >
> Although I have requested several times, I am not receiving the periodic store by store operating reports and the weekly store by store sales reports that are used in the ordinary course. >
> Thanks, >
> Richard Feferman >
> Sent from my iPad >"

From e-mail from Ted Burr dated September 17, 2013:
"Richard,
I am not aware of any requests that you have made for the "the periodic store by store operating reports and the weekly store by store sales reports that are used in the ordinary course" so this is the first time that I am knowledgeable about this request.
As we discussed during our last conversation on September 9th, I asked you to provide me with a written request for any outstanding or new information requests so we can

ensure you have everything. To date, I have not received any such request. So other then the information you have asked for per this e mail chain, I am not aware of any outstanding request.

As discussed previously, if you have any information or document request, please send me an e mail with a listing of what you would like. We need this is writing so we can track what is being requested and what has been produced.

Regards, Ted

PS - In the future, please don't send any business related e mails to my cox.net account as I don't check it everyday. Thanks."

When the Debtors finally began to provide electronic information to Mr. Feferman months after commencement of Mr. Feferman's involvement, the information was not complete and Mr. Feferman reported that they contained numerous discrepancies between the restaurant level profit and loss statements provided in connection with the Debtors' litigation with Ed Tinsley's companies and electronically stored information provided to Mr. Feferman. The Committee's instructions to Mr. Feferman were to examine the restaurant level financials, apply the corporate level expenditures and determine what cash flow is available for funding plan payments. This seems simple enough, but Mr. Feferman reported that during several teleconferences with the Debtors' financial advisor, Sierra, he found Sierra's personnel did not understand the restaurant level cash flow and were unable to reconcile the Debtors' projections. Mr. Feferman reported that the Debtors' own professionals complained that the Debtors' CEO, Mr. Wheaton, was combative and uncooperative with his own professionals. They found the Debtors' accounting records to be overly complicated. Apparently, the Debtors' management had complicated the process by bringing in a financial advisor that was unfamiliar with its operations and reporting information, but under the pretext that this was going to help the Committee in its efforts. Unfortunately, all this further delayed matters as it created an additional layer that Mr. Feferman was required to go through rather than allowing him to work informally with the Debtors' CFO.

During the months of August, September and October in 2012, the Debtors produced numerous complicated excel worksheets that were without footnotes and that were, according to Sierra, produced by the Debtors' internal staff (not Sierra). As both Feferman and Sierra were not familiar with the worksheets, making sense of the reports was complicated and required substantially more time than if the reports were properly footnoted and if the Debtors' personnel (familiar with the reports) were available to answer questions and provide explanation. During this time, Mr. Feferman reported since June 2012 he had been requesting updated, restaurant-by-restaurant operating results by four-week accounting period. This information was not provided until around the first of October 2012. Mr. Feferman reviewed the information and reported that he conferred with Sierra over what appeared to be a 27% shortfall in cash flow.

Indeed, Mr. Feferman advised the Committee that the actual operations reported by the Debtors in their operating reports demonstrated that the Debtors cash flow was 27% less than the projections the Debtors were relying upon to prove that creditors would be repaid. Mr. Feferman also advised the Debtors of this discrepancy. Almost immediately after this, on October 5, 2012, Mr. Feferman reported that he received an apologetic call from the principal of Sierra complaining about the poor quality of the Debtors' reports and advising that a completely new set of financial reports would be issued the next day. After Mr. Feferman uncovered all of the problems, the Debtors apparently realized they could no longer just stonewall the Committee because the Debtors finally began to actually cooperate. Indeed, it appears that this was the result of the Debtors not only being caught in their own mistakes, but also the result of the frustration of the Debtors' own financial advisor. This was followed up by a series of conference calls and exchanges of reports between the

respective financial advisors, and culminated with meetings in Phoenix about a month later between the respective financial advisors, and the Debtors' CFO. This ultimately resulted in an agreed on reconciliation of the Debtors' projections. It is unfortunate that this only occurred after Mr. Feferman expended so much hard work, but this is clearly the result of the Debtors' actions and pattern of conduct.

Once an agreed upon set of projections were achieved, the Committee (and particularly, Mr. Carroll as its counsel) could turn its efforts to negotiating terms of the plan that would eliminate all the loopholes and make certain that unsecured creditors would actually receive repayment—in addition to negotiating a quicker repayment. In this regard, two points are important for the Court to be aware of. First, the Committee members did not trust the Debtors in any way, and without the strong guidance of Mr. Feferman and Mr. Carroll, the Committee never would have agreed to any settlement with the Debtors and the Debtors would have been forced to attempt to confirm their plan over the Committee's objection. Second, since the Committee was now comfortable with the projections, the Committee could (and did) negotiate a settlement that reflected payments, which actually would be made, and even required the Debtors to make payments much sooner than originally promised.

There were numerous changes to the Plan negotiated by the Committee professionals. Most of these changes are incorporated in the stipulation between the Debtors and the Committee, dated December 2, 2012. One of the most important points negotiated for the benefit of the Committee, however, is not obvious on the face of the stipulation. This change, however, results in payment in full to all unsecured creditors before payments under

the original plan would even begin! All of the Debtors subsidiaries and affiliates also signed the stipulation, binding them to it and ensuring that they cannot sell real estate unless the proceeds are paid to creditors. The settlement also requires the Debtors to either sell certain real estate (with the proceeds going to creditors) or pay Wells Fargo and unsecured creditors approximately one-third of the total amount due, within 2 years. If the Debtors fail to do this a liquidating agent would be appointed with authority to act in place of the Debtors.

The settlement also includes many other benefits to unsecured creditors, including:

-- Incentives on the Debtors to make payments to unsecured creditors earlier than required, including that until unsecured creditors are paid in full:

-- the interest rate on unsecured claims increases every year until paid in full.

-- Strict limits are placed on the Debtors ability to compensate management, including:

-- no increase in compensation;

-- no bonuses;

-- no dividends to shareholders (this is especially important because Mr. Wheaton is the largest shareholder);

17

-- no new stock may be issued (unless the proceeds are paid to creditors);

-- no distributions may be made on Mr. Wheaton's claims; and

-- Mr. Wheaton may not sell any of his stock (unless the proceeds are paid to creditors).

Based on these negotiations and the advice of Mr. Feferman and Mr. Carroll, the Committee agreed to the Debtors' plan. The Committee never would have agreed to the plan, absent the efforts of Mr. Feferman and Mr. Carroll. As a result of their efforts, the treatment of unsecured creditors was greatly enhanced and protections were put in place further reducing the risks to unsecured creditors.

There is no question that the improper actions of the Debtors made this process much more difficult, time consuming and expensive. This is unfortunate, but these actions were all taken by the Debtors (in an attempt to avoid paying creditors), so the Court should not now listen to the Debtors' complaints about the cost of the Committee's professionals.

I believe unnecessary obstacles and inefficiencies were artificially created by the Debtors; and were it not for the bad faith efforts of the Debtors, this would have been a much easier (and cheaper) process.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of June, 2013, at Monroe, Louisiana.

_____
Fred King

-- no new stock may be issued (unless the proceeds are paid to creditors)

-- no distributions may be made on Mr. Wheaton's claims

-- Mr. Wheaton may not sell any of his stock (unless the proceeds are paid to creditors)

Based on these negotiations and the advice of Mr. Feferman and Mr. Carroll, the Committee agreed to the Debtors' plan. The Committee never would have agreed to the plan, absent the efforts of Mr. Feferman and Mr. Carroll. As a result of their efforts, the treatment of unsecured creditors was greatly enhanced and protections were put in place further reducing the risks to unsecured creditors.

There is no question that the improper actions of the Debtors made this process much more difficult, time consuming and expensive. This is unfortunate, but these actions were all taken by the Debtors (in an attempt to avoid paying creditors), so the Court should not now listen to the Debtors' complaints about the cost of the Committee's professionals.

I believe unnecessary obstacles and inefficiencies were artificially created by the Debtors and were it not for the bad faith efforts of the Debtors this would have been a much easier (and cheaper) process.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 28th day of June, 2013, at Monroe, Louisiana.

_____
Fred King

ORIGINAL electronically filed and
COPY served via email on July 8, 2013, to:


Wesley Ray
**POLSINELLI SHUGART**
One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Email: wray@polsinelli.com
Attorneys for the *Debtors*

Patty Chan
**OFFICE OF THE U.S. TRUSTEE**
230 N First Avenue, Suite 204
Phoenix, AZ 85003
Email:  patty.chan@usdoj.gov


*/s/ Kathryn Hardy*