Richard M. Lorenzen, Bar No. 006787
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
RLorenzen@perkinscoie.com
Telephone: 602.351.8000
Facsimile: 602.648.7000

Schuyler G. Carroll, NY Bar No. 2511707
*(Admitted Pro Hac Vice)*
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
SCarroll@perkinscoie.com
Telephone: 212.262.6905
Facsimile: 212.977.1636

*Attorneys for* the Official Joint Committee of
Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>STAR BUFFET, INC.,<br><br>              Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case No. 2:11-bk-27518-GBN and<br>Case No. 2:11-bk-27713-GBN |
| In re:<br><br>SUMMIT FAMILY RESTAURANTS, INC.,<br><br>              Debtor. | **DECLARATION OF OLGA FOURIER IN SUPPORT OF THE AMENDED FIRST AND FINAL FEE APPLICATIONS OF PERKINS COIE LLP AND CORPORATE RECOVERY ASSOCIATES**<br><br>Hearing Date: July 9, 2013<br>Hearing Time: 1:30 p.m.<br>Place:      Courtroom 702<br>                  230 N. First Avenue<br>                  Phoenix, Arizona |

I, Olga Fourier, declare as follows:

I am the principal of Oshunoa, LLC and Nareke, LLC and their authorized

representative as a member of the Official Joint Committee of Unsecured Creditors of Star Buffet, Inc. and Summit Family Restaurants, Inc. (the "Committee"). This declaration is made in support of the Amended First and Final Fee Application of Perkins Coie LLP and the First and Final Fee Application of Corporate Recovery Associates seeking entry of an Order Awarding Fees and Expenses.

I have reviewed the bills from Corporate Recovery Associates and Perkins Coie LLP and under the circumstances of this case, I believe they are reasonable. Moreover, they reflect work that the Committee requested be completed in order to develop and execute a strategy designed to maximize the recovery of unsecured creditors and ensure such recovery would be received within a reasonable period of time—much less than proposed by the Debtors—and to ensure the Debtors would not be able to avoid payment.

I understand that the Debtors are complaining that the rates charged by Mr. Carroll and Mr. Feferman are too high. Based on the other professionals considered by the Committee, however, we believe the rates are reasonable. In fact, the rates are lower than those requested by several other professionals.

Moreover, the Committee had a very difficult time obtaining counsel and a financial advisor, particularly in the Phoenix area. Numerous firms were already involved in the case and several firms advised that they could not become involved because of conflicts. What we ultimately learned is that because Wells Fargo was a secured creditor, most firms would

not be able to assist the Committee.  Any local firm we could find that was able to represent the Committee would only do so if the Committee members paid a substantial retainer and agreed to pay the professional fees incurred.  Since the Bankruptcy Code requires the Debtors to pay the fees, we did not believe it was appropriate for those firms to demand otherwise—and it made us uncomfortable that we might not get proper advice from such firms.  In addition, while the Debtors' Chapter 11 cases were filed in Phoenix, most of the Debtors' operations are not located in Phoenix.  Rather, their restaurants are spread across many states, the Debtors' CFO works primarily in Florida and the Committee members were spread across many states.

More importantly, however, while there undoubtedly are many excellent lawyers and financial advisors in Phoenix, based on our consideration of potential professionals, it became clear to us that the old saying "You get what you pay for" was true.  In particular, among the benefits of selecting Mr. Carroll and Mr. Feferman was that they each had a great deal of experience in the restaurant industry, particularly in working with similar chains.  For example, they recently worked together representing the creditors committee in the chapter 11 of McGrath's Seafood, a chain of similar restaurants.  In addition, Mr. Carroll described his experience representing the creditors committee of numerous other chain restaurant chapter 11 cases, including Apple Capitol, Sybra, Inc., ICH Corporation and Planet Hollywood.  Mr. Feferman described his experience advising and sitting on creditors' committees in numerous other restaurant cases including Boston West, LLC; Perkins Marie Callender's, Inc.; Steakhouse Partners, Inc.; and McGrath's Publick Fish House, Inc.  Mr.

Feferman further explained his experience in over 30 chapter 11 cases (as a post-confirmation fiduciary, committee advisor, advisor secured creditors, and post petition investors). Mr. Feferman also expanded on his experience with difficult debtors attempting to transfer value to themselves at the expense of unsecured creditors. Mr. Carroll also explained his experience in representing over 50 creditors' committees for nearly two decades. Mr. Carroll and Mr. Feferman explained that they would be able to handle this work primarily by themselves, without the need for teams of associates. Based on a review of their fee applications, it is clear this is exactly what they did and as a result the fees incurred are reasonable.

When the Committee interviewed Perkins Coie, we spoke with Mr. Carroll and although he explained that his firm had a Phoenix office and a very good bankruptcy partner in that office, when we hired Perkins Coie, we made it very clear that we expected Mr. Carroll to handle the work and not to hand us off to his partner or anyone else in the firm. Of course, we realized that New York lawyers charge more, but we believed that we needed counsel very experienced in representing creditors' committees and the Debtors.

When the Committee interviewed Corporate Recovery Associates, we spoke with Mr. Feferman and he explained that he has exceptional bankruptcy analysts on his staff at lower rates. When we hired Mr. Feferman we made it clear that we expected him to personally handle the Committee's work and not to assign it to others on his staff. The Committee was aware of Mr. Feferman's hourly rates and that there are other financial advisors in Phoenix

with both higher and lower billing rates, but given his background and extensive experience in working with uncooperative debtors attempting to transfer value to themselves at the expense of unsecured creditors, we wanted Mr. Feferman's services.

Throughout these Chapter 11 cases, Mr. Carroll and Mr. Feferman's combined experience clearly resulted in many cost savings simply because they understood the issues involved and did not need to research every detail or ask teams of associates or junior analysts to help them. For example, when Mr. Carroll reviewed the original plan, he very quickly pointed out numerous problems with the plan—including that the Debtors do not own any real estate, so that the purported lien they were granting provided no protection for the unsecured creditors and that the Debtors were not prohibited from paying huge bonuses to Mr. Wheaton, to ensure they had no free cash available to pay unsecured creditors. The Debtors unreasonably delayed providing information to the Committee and sometimes just did not provide requested information. Even without the cooperation of the Debtors, Mr. Feferman was able to zero in on potential fraudulent transfers to Mr. Wheaton and problems with the Debtors' accounting systems and controls. And as information dribbled in from the Debtors, Mr. Feferman identified inconsistencies between the Debtors' various financial reports that resulted in the issuance of a revised business plan from the Debtors, which ended the Committee's objection to the issue of feasibility.

Under the original plan, unsecured creditors would have waited for approximately seven years after the Committee engaged its professionals until we would be paid in full—

and that assumes that everything goes smoothly, the Debtors never have a problem, they never miss a payment, their operations always make projections, their real estate sells for at least the projected amounts (before they incur any additional expenses, such as interest, capital improvements or damage) and the Debtors actually comply with their obligations to make payment—even though the plan contained numerous loopholes that would allow them to avoid doing so. These are big assumptions (especially the last one, based on the Debtors' history) and over a very long time period.

Of course, it also assumes that no macro-level issues cause the Debtors' problems, such as a further downturn in the economy, a change in demographics in the areas of the Debtors' remaining restaurants or a change in the dining habits of the typical customer of the Debtors. There are numerous other problems that cannot be foreseen that could occur over the course of seven years. For example, with the thousands of employees working for the Debtors, the cost of the new healthcare system may be substantial and may cause the Debtors to be unable to meet projections (if not worse). All of these things are entirely out of the Debtors' control, but could have a very damaging effect on the Debtors' business, which would result in unsecured creditors not being paid. Indeed, under the original plan the first ones to be negatively affected were unsecured creditors, as we were forced to wait until all other payments were made until receiving any payment—and we could do nothing to force the Debtors to make payment.

Prior to the Debtors' bankruptcy filing, I had substantial experience with the Debtors, as did many other unsecured creditors and other committee members. Those experiences

demonstrated that the Debtors would take any action possible to frustrate our legitimate efforts to obtain payment.  Indeed, the Debtors repeatedly engaged in a shell game.  Almost immediately after we obtained a judgment, the Debtors created newly formed related entities and transferred assets to those new entities, in an attempt to create other obstacles to avoid us collecting any payment.

My experience was very similar to the experiences of other creditors.  Indeed, other committee members and several other creditors reported that they suffered from the Debtors' tactics and shell games.  This background was one of the primary reasons that we decided to hire professionals to represent the Committee and assist us after the Debtors' disclosure statement was approved.  I was very concerned that the plan was nothing more than the Debtors' next step to ensure creditors would never be paid anything.  Several of the Committee members shared this concern, as did other creditors.

Throughout the course of the Chapter 11 cases, we repeatedly reminded our professionals of these concerns and directed our professionals not to simply trust the Debtors, but to challenge all of their assertions and to make sure that every promise was fully documented in a manner that ensured the Debtors could not avoid compliance.

Indeed, under the original plan, the Debtors could take numerous steps that would preclude unsecured creditors from being paid, while at the same time, unsecured creditors could not take any action.  For example, the Debtors could substantially increase the salaries

of Mr. Wheaton and senior management, so that there would be insufficient cash available to make payments to unsecured creditors. In this event, the original plan provided no protection whatsoever for unsecured creditors. Rather, they could do nothing and the Debtors would not be required to make any payment under the terms of the plan. Similarly, the Debtors could pay large dividends to shareholders (of course, Mr. Wheaton owns almost 50% of the shares) or pay large bonuses to management. The Debtors also could sell their real estate to related parties for an amount that did not result in enough to pay unsecured creditors—even if they could be sold for substantially more. Under the terms of the original plan, unsecured creditors were entirely powerless to protect themselves or do anything to force payment. Of course, this list is not exhaustive and there are many other ways the Debtors—who had repeatedly demonstrated to me and other creditors their predilection to do anything they could to avoid making payments to creditors—could come up with to harm creditors.

As a result, we as Committee members were not comfortable waiting almost seven years or comfortable with the terms of the original plan, and we directed our professionals to develop a strategy that would ensure sooner recovery, with fewer assumptions, and would close all the loopholes.

While the Debtors might argue that they would not engage in the actions listed above (or anything else that would harm creditors), our experience with the Debtors taught us otherwise. Moreover, even absent that prior history, our counsel explained to us at the outset

of their representation that as committee members, we had a fiduciary duty to all unsecured creditors. As a result, we could not in good conscience leave open such possibilities, especially when we were acting for the benefit of all unsecured creditors.

The Debtors might also argue that Wells Fargo would not allow the Debtors to do this, but Wells Fargo's interests are not aligned with the unsecured creditors and the Debtors might pay off Wells Fargo or there might be other reasons that Wells Fargo would allow the Debtors to take action. In any event, there is nothing that ensures Wells Fargo would take any action to protect unsecured creditors.

We also directed our professionals to investigate and advise us as to whether any alternatives to the plan existed. In this regard, our professionals spoke with numerous third parties that might be interested in purchasing the Debtors assets. Mr. Feferman and Mr. Carroll were particularly helpful in this regard. Because of their extensive experience in the industry, they were able to reach out to many contacts that might be interested. Ultimately, however, it appeared that any interested purchaser was very unlikely to pay enough for unsecured creditors to benefit. Our professionals also explained that even if a third party was interested, any attempt to move forward with such a transaction would require a battle with the Debtors, which would be expensive, time consuming and not certain to succeed.

Shortly before confirmation of the plan, we discussed the potential alternatives to the plan with our professionals. Mr. Carroll and Mr. Feferman explained that even if a buyer or

investor would be willing to enter into a transaction with the Debtors, it was very unlikely that such a transaction would result in sooner recovery or, more unlikely, that the recovery would actually be paid to unsecured creditors. Because of the extensive experience in the industry, Mr. Carroll and Mr. Feferman were able to explain that the Debtors' business was particularly unlikely to allow for a third-party transaction that would benefit unsecured creditors, and the Committee members were sufficiently comfortable with their knowledge and expertise to rely on their recommendation. Thus, we directed them to negotiate changes to the plan that would result in sooner recovery and maximum protections.

Over the next few weeks, our professionals worked on these negotiations and reported their progress to the Committee. Ultimately, our professionals explained to us the changes and how these would benefit the unsecured creditors; they recommended that the Committee support the revised plan.

Even after our professionals negotiated all of these changes, the Committee members remained very hesitant to agree to the plan. We asked our professionals to analyze and present all other potential alternatives. Our professionals considered the potential risks that would result from pursuing each alternative and, after reviewing the alternatives, again determined that agreeing to the plan (as revised) was superior to all other alternatives. We, as the Committee members, however, remained very hesitant to agree.

In light of our prior history with the Debtors, it still was very difficult to persuade the

Committee members to agree. The Committee professionals, however, would not "take no for an answer." They were convinced that the best strategy would be to agree to the revised plan and a consensual resolution, without litigation. Mr. Carroll and Mr. Feferman went to great lengths to persuade us that the alternatives were unlikely to provide a better result, that the risks involved in the alternatives were substantial (and outweighed any potential benefits) and that the protections built into the plan would be sufficient to protect unsecured creditors.

The Committee professionals strenuously recommended that the Committee members support the plan and ultimately, after lengthy discussion, we agreed to consent to the plan and voted in favor of the plan. Before we did so, however, several of us (including myself) made very clear that we were only willing to do so, based on the overwhelming recommendation of the Committee professionals and that we were relying on their advice.

There is no question that the improper actions of the Debtors made this process much more difficult, time consuming and expensive. This is unfortunate, but these actions were all taken by the Debtors (in an attempt to avoid paying creditors), so the Court should not now listen to the Debtors' complaints about the cost of the Committee's professionals.

I believe the Debtors artificially created unnecessary obstacles and inefficiencies; and were it not for the bad faith efforts of the Debtors, this would have been a much easier (and cheaper) process.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this _____ day of July, 2013, at Bartlett, New Hampshire.

_____
Olga Fourier

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this __7__ day of July, 2013, at Bartlett, New Hampshire.

_____
Olga Fourier

ORIGINAL electronically filed and
COPY served via email on July 8, 2013, to:

Wesley Ray
**POLSINELLI SHUGART**
One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Email: wray@polsinelli.com
Attorneys for the *Debtors*

Patty Chan
**OFFICE OF THE U.S. TRUSTEE**
230 N First Avenue, Suite 204
Phoenix, AZ 85003
Email:  patty.chan@usdoj.gov


*/s/ Kathryn Hardy*