Richard J. Feferman, CIRA
**CORPORATE RECOVERY ASSOCIATES**
3830 Valley Centre Drive
Suite 705-152
San Diego, CA 92130
richard@crarecovery.com
Telephone: 858.792-7473
Facsimile: 858.430-2454

*Business and Financial Advisor for* the Official
Joint Committee of Unsecured Creditors

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>STAR BUFFET, INC.,<br><br>Debtor.<br><br>In re:<br><br>SUMMIT FAMILY RESTAURANTS, INC.,<br><br>Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case No. 2:11-bk-27518-GBN and<br>Case No. 2:11-bk-27713-GBN<br><br>**DECLARATION OF RICHARD J. FEFERMAN IN SUPPORT OF THE AMENDED FIRST AND FINAL FEE APPLICATIONS OF PERKINS COIE LLP AND CORPORATE RECOVERY ASSOCIATES**<br><br>Hearing Date: July 9, 2013<br>Hearing Time: 1:30 p.m.<br>Place:   Courtroom 702<br>    230 N. First Avenue<br>    Phoenix, Arizona |

I, Richard J. Feferman, declare as follows:

I am the Principal and Senior Managing Director of Corporate Recovery Associates ("CRA"). I am authorized to make this Declaration on behalf of CRA The matters stated herein are within my own personal knowledge, and, if called upon as a witness, I could and would competently testify thereto.

I am the party at CRA who had responsibility for representing the Official Joint Committee of Unsecured Creditors of Star Buffet, Inc. and Summit Family Restaurants, Inc. (the "Committee") in these Chapter 11 cases. I am a Certified Insolvency and Restructuring Advisor ("CIRA") and have been involved in various capacities in over 30 Chapter 11 cases during my career. This declaration is made in support of the Amended First and Final Fee Application of Perkins Coie LLP; the First and Final Fee Application of Corporate Recovery Associates seeking entry of an Order Awarding Fees and Expenses; and the corresponding replies in to the Debtors' objections thereto.

I am also the party at CRA responsible for preparing the CRA's reply to the Debtors' objection to CRA's fee application (the "Reply"), and I have reviewed thoroughly the Reply. To the best of my knowledge, the factual assertions contained in the Reply regarding CRA's representation of the Committee in the Debtors' Chapter 11 cases are materially correct.

The work done by the Committee professionals was all undertaken at the direction of the Committee members and resulted in direct and measurable benefit to the unsecured creditors. Moreover, actions taken by the Committee professionals were reasonable and appropriate. Any complaint about the amount of fees incurred should be directed squarely at the Debtors, as it was their own conduct that forced the Committee professionals to take the actions they did.

It is my standard practice to meet at a debtor's offices as soon as possible after being engaged and this Committee instructed me to familiarize myself with the Debtors' including

the Debtors' (and the Debtors' subsidiaries and affiliates) assets, business operations, cash flow, prospective avoidable transfers, and alternatives for repayment to creditors. I was also instructed to be at the Debtors' headquarters as soon as possible and to use my best efforts to constructively work with management in order to facilitate the Committee's efforts.

One of the most important reasons is to begin working closely with management is to determine the debtor's cash flow. To give a simple example, with a company with multiple restaurants ("Units") it is critical to accurately determine the cash flow of each individual unit, negative or positive. The cash flow for the individual Units is aggregated; at CRA we sometimes call this "Unit Level Cash Flow".

In the next step we want to accurately determine the cash flow generated or consumed outside of the Unit Level at the headquarters level or in this simple explanation, the "General and Administrative Costs" which usually are the items that are not allocated to specific Units.

Adding the Unit Level Cash Flow to the General and Administrative Costs will give provide an analyst with the Cash Flow for the entire enterprise. In the real world it is a little more complicated than this, but not much more – just a few nuances here and there; but this is the general idea. With this "Enterprise Level Cash Flow" an analyst can estimate a debtor's capacity to pay claims.

In the Debtors' case I used my best efforts to arrange to travel to Phoenix to meet with management and understand the Debtors' cash flow in early June 2012. My efforts to do my job were rejected by the Debtors' CEO Robert Wheaton and I was not permitted to meet with the Debtors' CFO until the end of October 2012. A job that should have taken a couple of

weeks was wastefully turned into a five month exercise of circumnavigating obstacles constructed by the Debtors to hinder the Committee's efforts to do its job.

Not only was I not allowed to meet with the CFO, but I was instructed by the Debtors' counsel to route all communications through the a gentleman that had no previous experience with the Debtors' Ted Burr of the Sierra Consulting Group who would be serving as the Debtors' financial advisor.

In late June I did have a teleconference with the Debtors' CFO and CEO, but without any financial information for the individual Units. During the conversation I attempted to arrange a meeting with management, but they were unwilling to commit to a timely date. Mr. Wheaton (the CEO) seemed agitated and accused me of being on a "fishing expedition". He threatened to hang up if I asked questions about any liabilities other than traditional first liens secured by real property.

I asked the CFO ("Mr. Dowdy") to describe what kind of Unit Level management reports they used in their ordinary course of business. Mr. Dowdy described a couple of different reports that seemed typical for the industry that are generated for each restaurant for each 1-week and 2-week period. I asked if I could get copies of these to help become familiar with operations. Mr. Wheaton refused and said that they were currently too busy to provide me with anything.

In July I did receive pursuant to a 2004 examination over 3,000 disorganized Unit Level P&Ls in a pdf format ("PDF Reports"), although I requested the information in any electronic format compatible with excel. I am not familiar with any financial software that cannot generate reports that are readable with excel, and I sent an email to the Debtors

professionals notifying them that having to use the PDF Reports will needlessly add many hours of time to the job. The financial information was provided without footnotes or other narrative materials to aid in understanding. When questioned, the Debtors' new financial advisor stated that he was not going to examine the PDF Reports.

In the beginning of August 2012, two months after being engaged I began receiving electronic information. This was almost always without explanatory footnotes or other narrative explanation. Also the Debtors' financial advisor was unfamiliar with the information and unable to timely answer my questions. I was not permitted to communicate with Mr. Dowdy, the only person that could answer my questions aimed at clarifying the Committee's understanding of the feasibility of the Debtor's business operations. The problems recited herein were exacerbated as the various financial reports provided did not all appear to be consistent. For example projections were provided along with actual results, and although not apparent in the Debtors' disclosure statement, these internal reports possibly indicated that the Debtors' financial results were missing projections by wide margins; but no one was available to provide an explanation and put the reports in context. The Debtors' financial advisor stated that they were not examining the Unit Level information and were still reviewing information, and could not answer my questions concerning items including but not limited to working capital; how the Debtors' cash balances "draw down" with payrolls during a typical month; capital expenditures; occupancy costs of real estate owned v. leased locations; details on what expense figures from p&ls to add back for cash flow calculations; and many other topics. The Debtor's financial advisors were unable to have a discussion regarding how changes at any particular Unit could impact

the whole.

As the Debtors' financial advisors did not participate in creating the Debtors' business plan, projections, or financial statements and had completed only minimal work and very limited analysis, each time I had a question or request, the Debtors' financial advisors were required to go back to the Debtors and ask the same question or make the same request. As a result, it was a difficult and lengthy process just to get an answer to a simple question. Eventually in October 2012 the Debtors' financial advisor began to also have problems with the reconciliation of the Debtors' accounting reports. Newly revised financial packages were provided to me (again without footnotes or explanatory narrative) and in forwarding them said that the information is still "a work in progress and should not be considered final work product" and that the Debtors' financial advisor could discuss this new information today – but "can't afford to spend more than 30-45 minutes."

During October 2012 the Debtors financial advisor and I conducted a series of teleconferences to work through the Debtors financials, still without the participation of the Debtors' CFO, the person knowledgeable about the reports that we were deciphering. Finally at the end of October 2012 I was invited to Phoenix and spent two days working with the Debtors' financial advisor and also the CFO. During this time we were able to complete our joint reconciliation of the Debtors' financial reports with the Debtors' projections which enabled me to recommend to the Committee to not object to the Debtors' plan confirmation on the basis of feasibility.

Feasibility was not the Committee's only leverage. This Committee was made up of

unhappy creditors that was overly anxious to fight and wanted their professionals to find every angle of attack. The members had to be counseled that litigating or derailing the confirmation of a plan could result in the Debtors' Estate becoming administratively insolvent with no recovery for unsecured creditors, but on the other hand it would expose the Debtors' CEO to an adversarial action for recovery potential fraudulent transfer of almost $2,000,000.00 when the Debtors were probably insolvent as well as possible claims from others including the internal revenue service for trust funds (see claim no. 15 of the IRS for $2,481,149.76).

However under the original plan, unsecured creditors would have waited for approximately 7 years after filing bankruptcy until they would be paid in full -- and that assumes that everything goes smoothly, the debtors never have a problem, they never miss a payment, their operations always make projections and their real estate sells for at least the projected amounts. These are big assumptions for a very long time period. As a result, the Committee members were not comfortable waiting that long and directed their professionals to develop a strategy that would ensure sooner recovery, with fewer assumptions.

Through skillful negotiations and the results of our diligence Mr. Carroll and I were able to negotiate a stipulation with the Debtors' that greatly reduces the risks for unsecured creditors and provides them a recovery years before that proposed by the Debtors. This stipulation is integrated into the confirmation order (Dkt. No. 316). This stipulation (the "Committee Stipulation") enjoins the Debtors' non-debtor affiliates from disposing of assets without distributing proceeds as set forth under the plan of reorganization. It provides for

additional financial restrictions and reporting requirements and also provides for the appointment of a Liquidating Agent acting as a fiduciary for unsecured creditors if mileposts are not met. The chart and footnotes illustrate the minimum improvement under the Committee Stipulation:

| Time Period Per Debtors' Fiscal Year (ending January) | Payment Schedule **before** Committee Stipulation | Minimum Payment Schedule after Committee Stipulation (additional Payments required based on real estate sales required to commence prior to 2nd anniversary of Effective Date) |
|---|---|---|
| FYE 2013 (Short Year 8-Months | $0 | $0 |
| FYE 2014 | $0 | $0 |
| FYE 2015 | $0 | $675,000.00 |
| FYE 2016 | $0 | $392,738.00 |
| FYE 2017 | $0 | $1,217,093.79 |
| FYE 2018 | $1,762,000.00 | |
| FYE 2019 | $575,964.00 | |

Notes to chart above:

(1) Please note that as an alternative to the $675,000.00 payment to unsecured creditors before the 2nd anniversary of the effective date, the Debtors' may sell 3 properties specified in the Confirmation Order pursuant to stipulation with the Committee. According to the Debtors own projections in the Declaration of Robert Wheaton (Dkt. No. 294, page 26) this will result in payment to unsecured creditors of $1,125,000.00 before the 2nd anniversary of the effective date as opposed to the $675,000.00. Under the Confirmation Order (pursuant to the Debtors' stipulation with the Committee) failure to achieve either results in a Court appointed liquidating agent as a fiduciary for general unsecured creditors charged with the responsibility of liquidating specific properties for the benefit of general unsecured creditors.
(2) Assumed Amount of Allowed Claims $2,000,000.00 (source: Debtors Projections)
(3) Draft is subject to change
(4) Interest Rate Under Debtors' Plan = 3.25% per annum from Effective Date
(5) Interest Rate After Committee Stipulation =3.25% per annum from Effective Date and increases by 100 basis points (1%) on each subsequent anniversary of the Effective Date
(6) Payment in FYE 2015 is required minimum Payment if the Debtors have not sold Kissimmee, Hudson, and Scottsdale properties. Default results in Court Appointed

(7) Payments in FYE 2016 is composed of payments that would have gone to Robert E. Wheaton under Debtors' Plan but to unsecured creditors under Committee Stipulation ($64,738 est); and $328,000 resulting from the early payoff of Wells, which is required under the Committee Stipulation

(8) Payments in FYE 2017 Composed of Payments that would have gone to Wheaton under Debtors' Plan but to unsecured creditors under Committee Stipulation ($64,738.00 est); and $1,152,355.00 resulting from early payoff of Wells required Under Committee Stipulation.

(9) Payments in FYE 2018 and FYE 2019 are as represented in the Debtors' *Summary of Debtors' Projection and Cash Available for Plan Payments* as contained in the Report of Edward Burr (Dkt No. 296; page 22 of 34).

The Debtors' now allege (without any evidence or reference actual cash or operations) that payment of the fees and reimbursement of costs requested by the Committee's professionals will jeopardize the successful execution of their plan of reorganization. This is directly contrary, however, to the statements of the Debtors at the time they sought this Court's approval of the plan. Those prior statements were specific evidentiary statements, with reference to detailed financial information and were submitted under penalty of perjury by the Debtors' CEO, Robert Wheaton and financial advisor, Edward Burr. Those prior statements directly contradict the Debtors' current assertions. Per the Report of Edward Burr (Dkt. No.296 and the Declaration of Robert Wheaton in support of the Confirmation of Second Amended Joint Plan of Reorganization dated 10/17/12 (Dkt. No. 294) The Debtors estimated Effective Date Payments were to be $995,000.00 including $200,000.00 for Committee Professionals which has never been paid.

The submissions of Mr. Wheaton and Mr. Burr stated that even after the payment of $200,000.00 to Committee Professionals and all other payments required to be made on the Effective Date, the Debtors would have $971,381.00 in cash available, as of the end of their fiscal year 2013 (which ends in January 2013). The declarations also state that after all these payments are made (including the $200,000.00 that has not been paid to Committee

Case 2:11-bk-27518-GBN    Doc 421    Filed 07/08/13    Entered 07/08/13 11:42:06    Desc
Main Document    Page 9 of 16

Professionals) the Debtors would have $1,116,539.00 in cash available, as of the end of their fiscal year 2013 (which ends in January 2014). See the chart below:

|  | **FYE 2013 (January 2013)** | **FYE 2014 (January 2014)** |
|---|---|---|
| End of Period Cash Per Debtors' Plan | $971,381.00 | $1,116,539.00 |
| Add Back $200,000.00 In Line Item "Administrative Claims – Creditors Committee <u>that has not been paid</u> | $200,000.00 | $200,000.00 |
| Total Estimated Cash at End of Period | **$1,171,381.00** | **$1,316,539.00** |

Additionally Mr. Wheaton in his declaration represents that $400,000 of additional financing is available. It is important to note that the Debtors do not allege that anything has changed since confirmation of the plan, nor do they allege they have had any problems performing up to their projections, nor that they have missed any plan payments. Based on the Debtors' own statements, it is clear that the Debtors have more than sufficient cash to make the payments necessary to pay the Committee professionals and that their attempt to allege that making payments to the Committee professionals will prejudice the Debtors and creditors is entirely untrue.

The declarations submitted by the Debtors also make clear that the Debtors were well

aware of the amount of fees incurred by the Committee professionals. The true facts -- as confirmed by the undisputed testimony of the Debtors' own CEO and financial advisor -- demonstrate that the Debtors' present self-serving statements are entirely untrue. Indeed, not only are the Debtors' assertions regarding their inability to pay professionals entirely incorrect, but their allegations about the work of the Committee professionals throughout the cases is similarly incorrect, as demonstrated by the declarations submitted with this response.

It is also ironic that the Debtors have characterized this as a simple case. Nothing could be further from the truth - and the Debtors actions made this even more complex. For example, one of the Debtors, Star Buffet, Inc., is a public company with millions of shares outstanding. The other debtor, was described as a company that no longer operates. The overall structure, however, includes nearly 25 wholly owned subsidiaries and affiliates, with more than 50 restaurant locations and thousands of employees.

The Committee Chair reported to me that until about May of 2012, the Committee had not been able to find professionals to represent its interests without a guarantee of payment (from the Committee members), or alternatively a retainer. Until that time the Committee primarily attempted to find counsel located in the Phoenix area. Many of the lawyers contacted by committee members were conflicted or already representing another party in the cases. At the end of May or the beginning of June 2012, the Committee members' search expanded to outside of the local market and the Committee was able to identify several attorneys and financial advisors that were not conflicted and who would be willing to assist the Committee, without guarantee of payment. The Committee was

desperate and asked me to reach out to several firms, of which I contacted four Cooley (not interested because of the risk of getting paid), Arent Fox (interested), Perkins Coie (interested), and Ray, Quinney & Nebeker (no interest due to conflict with Wells). I also introduced the Committee Chair to a competitor of CRA for him to consider. The Committee then conducted a telephonic meeting on June 5, 2012 in which it unanimously voted to hire Perkins Coie and Corporate Recovery Associates.

The Committee made very clear that they expected Mr. Carroll to handle the work and not to hand us off to his partner or anyone else in the firm. Of course, we realized that New York lawyers charge more, but we believed that we needed counsel very experienced in representing creditors committees and the Debtors'.

When the Committee interviewed me I explained that I employee exceptional bankruptcy analysts at lower rates. The Committee made it clear that they expected me to personally handle the committee's work and not to assign it to others on my staff. The Committee was aware of my hourly rates and extensive experience in working with uncooperative debtors attempting to transfer value to themselves at the expense of unsecured creditors.

Throughout these chapter 11 cases this experience clearly resulted in many cost savings, because Mr. Carroll and I understood the issues involved and did not need to research every issue or ask teams of associates or junior analysts to help. For example, when Mr. Carroll reviewed the original plan, he very quickly pointed out numerous problems with the plan - including that the Debtors do not own any real estate, so that the purported lien

they were granting provided no protection for the unsecured creditors and that the Debtors were not prohibited from paying huge bonuses to Mr. Wheaton, to ensure they had no free cash available to pay unsecured creditors. Without the cooperation of the Debtors' I was able to zero in on potential fraudulent transfers to Mr. Wheaton and problems with the Debtors' accounting systems and controls. And as information dribbled in from the Debtors' Mr. Feferman identified inconsistencies between the Debtors' various financial reports that resulted in the issuance of a revised business plan from the Debtor, which ended the Committee's objection to the issue of feasibility. Additionally Mr. Carroll and I coordinated our activities so as not to duplicate efforts.

The Committee was very concerned that the Debtors financial projections were not reasonable and that if the Debtors did not meet those projections, unsecured creditors were almost guaranteed to never receive any payment at all, let alone payment in full. The Committee instructed the principal of Corporate Recovery Associates, Richard Feferman, to familiarize himself with the Debtors' including the Debtors' (and the Debtors' subsidiaries and affiliates) assets, business operations, cash flow, prospective avoidable transfers, and alternatives for repayment to creditors. Mr. Feferman was also instructed to be at the Debtors' headquarters as soon as possible and to use his best efforts to constructively work with management in order to facilitate the Committee's efforts.

There is no question that the improper actions of the Debtors made this process much more difficult, time consuming and expensive. This is unfortunate, but these actions were all taken by the Debtors (in an attempt to avoid paying creditors), so the Court should not now listen to the Debtors' complaints about the cost of the Committee's professionals.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of July, 2013, at San Diego, CA.

_____
Richard J. Feferman

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 8th day of July, 2013, at San Diego, CA.

*/s/ Richard J. Feferman*
Richard J. Feferman

ORIGINAL electronically filed and
COPY served via email on July 8, 2013, to:


Wesley Ray
**POLSINELLI SHUGART**
One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Email: wray@polsinelli.com
Attorneys for the *Debtors*

Patty Chan
**OFFICE OF THE U.S. TRUSTEE**
230 N First Avenue, Suite 204
Phoenix, AZ 85003
Email:  patty.chan@usdoj.gov


*/s/ Kathryn Hardy*