Richard M. Lorenzen, Bar No. 006787
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
RLorenzen@perkinscoie.com
Telephone:  602.351.8000
Facsimile:  602.648.7000

Schuyler G. Carroll, NY Bar No. 2511707
*(Admitted Pro Hac Vice)*
**PERKINS COIE LLP**
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
SCarroll@perkinscoie.com
Telephone:  212.262.6905
Facsimile:  212.977.1636

Attorneys for the Official Joint Committee of
Unsecured Creditors

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>STAR BUFFET, INC.,<br><br>               Debtor. | Chapter 11<br><br>Jointly Administered<br><br>Case No. 2:11-bk-27518-GBN and<br>Case No. 2:11-bk-27713-GBN |
| In re:<br><br>SUMMIT FAMILY RESTAURANTS, INC.,<br><br>               Debtor. | **DECLARATION OF SCHUYLER G. CARROLL IN SUPPORT OF THE AMENDED FIRST AND FINAL FEE APPLICATIONS OF PERKINS COIE LLP AND CORPORATE RECOVERY ASSOCIATES**<br><br>Hearing Date:  July 9, 2013<br>Hearing Time:  1:30 p.m.<br>Place:  Courtroom 702<br>          230 N. First Avenue<br>          Phoenix, Arizona |

I, Schuyler G. Carroll, declare as follows:

This declaration is made in support of the Amended First and Final Fee Application of Perkins Coie LLP and the First and Final Fee Application of Corporate Recovery Associates seeking entry of an Order Awarding Fees and Expenses, both of whom were engaged to represent the Official Joint Committee of Unsecured Creditors of Star Buffet, Inc. and Summit Family Restaurants, Inc. (the "Committee").

I am a partner of Perkins Coie LLP and the New York Office Managing Partner. In March 2011, I joined Perkins Coie and opened the New York Office. I began practicing law at Shearman & Sterling in 1992, after graduation from St. Johns Law School and practiced at several different law firms before joining Perkins Coie. Since law school my practice has focused on bankruptcy, restructuring and creditors rights issues. For most of my career, the majority of my time has been spent representing creditors committees in Chapter 11 cases. I have represented more than 50 creditors committees. In addition, I have represented creditors as members of creditors committees in dozens of Chapter 11 cases.

I have substantial experience in the restaurant industry and particularly working with chains similar to the Debtors'. For example, I recently worked with Mr. Feferman representing the creditors committee in the chapter 11 of McGrath's Seafood, a chain of similar restaurants. I represented the creditors committee and committee members in numerous other chain restaurant chapter 11 cases, including Apple Capitol, Sybra, Inc., ICH Corporation and Planet Hollywood. Much of my bankruptcy experience has been in the courts in New York, but over the years a large portion of my work has been in cases in other districts, including California, Washington, Pennsylvania, Oklahoma, Florida, Texas, Georgia and West Virginia.

Prior to the time the Committee selected Perkins Coie as counsel, I understand that the Committee had a very difficult time obtaining counsel and a financial advisor, particularly in the

- 2 -
LEGAL27209408.2
Case 2:11-bk-27518-GBN    Doc 422    Filed 07/08/13    Entered 07/08/13 14:15:47    Desc
Main Document    Page 2 of 18

Phoenix area. Although I was not involved at the time, my understanding comes from discussions with the Committee members and their counsel describing their efforts to obtain professionals to represent the Committee. Numerous firms were already involved in the case and several firms advised that they could not become involved because of conflicts. It appears that because Wells Fargo was a secured creditor, most firms in Phoenix would not be able to assist the Committee. The only local firms the Committee found that were not precluded from representing the Committee would agree to do so only if the Committee members paid a substantial retainer and agreed to pay the professional fees incurred. Since the Bankruptcy Code requires the Debtors to pay the fees, the Committee members did not believe it was appropriate for those firms to demand otherwise. In addition it made the Committee members uncomfortable that they might not get proper advice from such firms—if they were not prepared to abide by the Bankruptcy Code at the outset, how could the Committee expect to obtain unbiased, expert advice on substantive issues during the case? In addition, while the Debtors' Chapter 11 cases were filed in Phoenix, most of the Debtors' operations are not located in Phoenix. Rather, their restaurants are spread across many states, the Debtors' CFO works primarily in Florida and the Committee members were spread across many states.

The Committee members advised me, however, that more important to their consideration of the choice of professionals than location was the experience of the particular professionals. While there are many excellent lawyers and financial advisors in Phoenix, based upon the Committee's consideration of potential professionals, the Committee members believed that the old saying "You get what you pay for" was true. The Committee members believed that my substantial experience and that of Mr. Feferman, particularly, in restaurant cases, representing creditors committees and where the Debtors are controlled by an insider that has a

history of being difficult in working with creditors, would provide substantial added value, while at the same time, allowing for efficient handling of the issues.

Among other things, I explained to the Committee that we would be able to handle this work primarily by ourselves, without the need for teams of associates. A review of our fee applications, makes clear this is exactly what we did. Indeed, the majority of the work on this case was provided by me, without support from associates or other partners. From the outset of this case, this staffing was a conscious decision, primarily based on the desire to keep fees low. In nearly every case where I represent a creditors committee, there is an associate (and often more than one) that assists in every aspect of the case. In this regard, the associate(s) typically will attend every meeting and hearing and participate in every call. My experience is that this is true for nearly every law firm that represents creditors committees and certainly has been true in all of the cases where I represented members of the committee, whether the case was in New York or elsewhere.

In a direct effort to keep fees low, I specifically chose not to do so in this case and made sure that I handled most matters personally. The Debtors have chosen to object to my rate, but have ignored the fact that this matter was handled quite efficiently and without any duplication of effort.

In addition, it is important to recall that Perkins Coie was following the direction of the Committee members in staffing this case. When the Committee interviewed me, I explained that we have a Phoenix office and a very good bankruptcy partner in that office. The Committee, however, made very clear to me that it expected I would handle the work and not hand off this engagement to anyone else in the firm. I explained that my rate is higher than Mr. Lorenzen's, but the Committee told me it believed it needed counsel very experienced in representing

creditors committees and the Debtors' industry. In this regard, it is important to note that, particularly at the time the Committee selected Perkins Coie as counsel, the Committee members were quite upset with the Debtors' actions, believed that the Debtors' plan was a sham designed to ensure that unsecured creditors would never get paid and that unless the Committee developed a shrewd strategy, the Debtors would succeed.

Throughout these Chapter 11 cases, the specific relevant experience that Mr. Feferman and I have resulted in many cost savings simply because of our immediate understanding of the issues involved. As a result, we did not need to research every issue and did not need to obtain assistance of junior people. For example, when I reviewed the original plan, I quickly pointed out numerous problems with the plan—including that the Debtors do not own any real estate, so that the purported lien they were granting provided no protection for the unsecured creditors, and that the Debtors were not prohibited from paying huge bonuses to Mr. Wheaton, to ensure that they had no free cash available to pay unsecured creditors. Similarly, even without the cooperation of the Debtors, Mr. Feferman was able to zero in on potential fraudulent transfers to Mr. Wheaton and problems with the Debtors' accounting systems and controls. And as information dribbled in from the Debtors, Mr. Feferman identified inconsistencies between the Debtors' various financial reports that resulted in the issuance of a revised business plan from the Debtors, which ended the Committee's objection to the issue of feasibility.

The Debtors' objection to Perkins Coie's fees alleges that the fees are excessive because the original plan proposed to pay creditors in full, with interest and provide collateral for the payments to unsecured creditors. While on its face these are true statements, in practice confirmation of the original plan was virtually certain to result in no payment whatsoever to unsecured creditors. As a result of the efforts of the Committee's professionals, however, the

confirmed plan is based on projections supported by the Debtors' actual operations (that the Debtors are likely to be able to meet) and has many substantive protections to ensure creditors will be paid. More important, plan payments to unsecured creditors now begin much sooner—so that they will be paid in full before any payments under the original plan would have started, and the plan now actually requires the Debtors to sell certain properties within a certain date if the Debtors have not already made certain additional payments (that will further speed up repayment) to unsecured creditors.

The Debtors' objection is based on their view that because they filed a plan which purportedly promised to pay creditors in full, the Committee should not be permitted to participate in these cases—despite the Committee's fiduciary duties to protect the interests of the entire unsecured creditor body. The Debtors made their view clear since they objected to the Committee's retention of professionals, making the same argument. Rather than working with the Committee and listening to the concerns of the Committee members, the Debtors have consistently taken the position that the Committee should do nothing and not get involved in the Chapter 11 cases. It is this adversarial attitude, and the Debtors' actions resulting from it, that caused much of the Committee's professional fees. From the beginning we believed our primary goal in representing the Committee (based, of course on consultation with and direction from the Committee members) should be to determine whether the Debtors' assets and cash flow were sufficient to support the proposed plan. Unfortunately, the Debtors made it impossible to begin that task. The Debtors' actions made clear their intention was to keep the Committee from satisfying its fiduciary obligations to analyze the Debtors' operations. Indeed, since the Committee engaged its professionals, the Debtors put up every obstacle possible, rather than cooperating with the Committee. For example, rather than working off an informal information

request (as debtors do in nearly every case), the Debtors made the Committee file its own 2004 application (even after the Court already had granted an Application Pursuant to Bankruptcy Rule 2004 requested by Tinsley Hospitality). After the Court granted the Committee's request, the Debtors still did not provide the Committee with any usable financial information, but instead resorted to litigation tricks and dumped massive documents on the Committee. All of which was provided only in PDF format (rather than Excel or other accounting-type software, which would allow analysis). As a result, the only way we could review the information was to manually go through and compare each individual file—a task that could take hundreds of hours. As one example, the Debtors sent 3,028 individual PDF files which appear to be P&L statements.

But this was not the end of the Debtors' lack of cooperation and efforts to make our efforts more difficult. When I was first engaged I suggested a call with the Debtors. This is very typical at the beginning of a case. When the call was scheduled, I specifically told the Debtors' counsel that the purpose would be to allow the Debtors to explain how they intended to ensure creditors would receive repayment and why creditors should be comfortable they would receive repayment even though no payments would begin for nearly 5 years. I invited the Debtors to make a presentation to the Committee and explained that the most important areas to address were what caused the Debtors to lose money and how the Debtors would achieve a turnaround that would allow them to repay creditors.

Rather than use this opportunity to work with us, to persuade the Committee members of the benefits of the plan and attempt to gain the support of the Committee members, the Debtors immediately made clear that they would do nothing of the kind. Indeed, during that first (and only) direct interaction between Debtors' management and the Committee members, the Debtors

did not make a presentation, did nothing at all to garner the support of the Committee and it was apparent that the Debtors did not even prepare for the call. The Debtors continued their pattern of treating the Committee as their adversary, refusing to provide answers to most of the questions asked by Committee members. The Debtors' management barely even participated and the Debtors' counsel did nearly all of the speaking.

As it became clear that the Debtors did not prepare for the call, I entreated the Debtors to be more forthcoming, to work with the Committee and to attempt to persuade the Committee members, but these efforts were similarly met with resistance. After the call, I again spoke with Mr. Forrester and attempted to persuade him of the benefit of working with the Committee. During this call, it became clear that while Mr. Forrester agreed, his client (and specifically, Mr. Wheaton) would not cooperate and could not be persuaded otherwise.

In my experience it is extremely rare for a debtor to act in this manner towards the Committee. To the contrary, debtors almost always try to make the Committee their ally whenever possible. In nearly every case, debtors attempt to gain the support of the committee and persuade the committee members to work with the debtor, so that they may have an ally. In nearly every case, debtors' management will prepare extensive presentations, typically with PowerPoint materials and handouts. Often, management will invite the committee members to headquarters for a tour or a lunch or dinner, so they can get to know each other better and develop a personal relationship. Here, however, the Debtors did exactly the opposite. Every comment from the Debtors was adversarial and the Debtors never attempted to work with the Committee. As a result, the Committee members were even more concerned and skeptical of the Debtors. During our next discussion the Committee members expressed additional concern to

me, based on the discussion with the Debtors, that the Debtors were trying to hide things from the Committee.

The overall concerns expressed by the Committee to me fall into two general categories. The first concern was that the Debtors' operations would not be sufficient to make repayment to creditors. Indeed, the Debtors had been losing money for several years and it was entirely unclear whether they had made any changes that would create a turnaround. The only information available was a basic set of projections, which later proved (based on our work) to be unsupportable and were entirely revised by the Debtors.

The second concern was that the plan provisions would not be sufficient to ensure that creditors would actually be repaid. In fact, several Committee members repeatedly indicated that the Debtors had refused to pay despite prior agreements, court orders and judgments in their favor—and in fact, the Debtors transferred assets to avoid payments, contrary to the terms of those documents—so why and how would the plan be able to change the Debtors?

Under the original plan, unsecured creditors would have waited for approximately seven years after the Committee engaged its professionals until receiving payment in full. But that payment would only be received if everything went smoothly—the Debtors never had a problem, they never missed a payment, their operations always made projections, their real estate sold for at least the projected amounts (before they incurred any additional expenses, such as interest, capital improvements or damage) and the Debtors actually complied with their obligations to make payment—even though the plan contained numerous loopholes that would allow them to avoid doing so. These are big assumptions (especially the last one, based on the Debtors' history) and require all the assumptions to continue for a very long period of time.

Payment under the original plan also assumes that no macro-level issues cause the Debtors problems, such as a further downturn in the economy, a change in demographics in the areas of the Debtors' remaining restaurants or a change in the dining habits of the typical customer of the Debtors. There are numerous other problems that cannot be foreseen that could occur over the course of seven years. For example, with the thousands of employees working for the Debtors, the cost of the new healthcare system may be substantial and may cause the Debtors to be unable to meet projections (if not worse). All of these things are entirely out of the Debtors' control but could have a very damaging effect on the Debtors' business, which would result in unsecured creditors not being paid. Indeed, under the original plan the first ones to be negatively affected were unsecured creditors, as they were forced to wait until all other payments were made until receiving any payment—and unsecured creditors could do nothing to force the Debtors to make payment.

At the outset of this engagement, the Committee members told me about their experiences with the Debtors, in which they demonstrated that the Debtors would take any action possible to frustrate the legitimate efforts of creditors to obtain payment. Many examples were relayed to me. Perhaps the most striking was by Ms. Fourier, who explained that the Debtors repeatedly engaged in a shell game; almost immediately after her company obtained a judgment, the Debtors created newly formed related entities and transferred assets to those new entities, in an attempt to create obstacles to avoid collection. Several other Committee members and creditors described similar experiences.

Throughout the course of the Chapter 11 cases, the Committee members repeatedly reminded me and Mr. Feferman of their experience with the Debtors and directed us not to simply trust the Debtors, but to challenge all of their assertions and to make sure that every

promise was fully documented in a manner that ensured that the Debtors could not avoid compliance. In addition to their pre-petition experience, the Committee members also were concerned about this because under the original plan, the Debtors could take numerous steps that would result in unsecured creditors not being paid, while at the same time, unsecured creditors could not take any action. For example, the Debtors could substantially increase the salaries of Mr. Wheaton and senior management so that there would be insufficient cash available to make payments to unsecured creditors. In this event, the original plan provided no protection whatsoever for unsecured creditors; since the Debtors could assert that there was no free cash flow available, they would not be required to make payments to unsecured creditors and the Debtors would not be in default of the plan. Similarly, the Debtors could pay large dividends to shareholders (of course, Mr. Wheaton owns almost 50% of the shares) or pay large bonuses to management. The Debtors also could sell their real estate to related parties for an amount that did not result in enough to pay unsecured creditors—even if they could be sold for substantially more. Under the terms of the original plan, unsecured creditors were entirely powerless to protect themselves or do anything to force payment. This list is not exhaustive, and there are many other ways that the Debtors—who had repeatedly demonstrated their predilection to do anything they could to avoid making payments to creditors—could come up with to avoid creditors collection efforts.

The Committee members made clear to me from the outset that they were not comfortable waiting almost seven years nor were they comfortable with the terms of the original plan. As a result, the Committee members directed me and Mr. Feferman to develop a strategy that would ensure sooner recovery, that would have fewer assumptions, and that would close all the loopholes.

LEGAL27209408.2
Case 2:11-bk-27518-GBN   Doc 422   Filed 07/08/13   Entered 07/08/13 14:15:47   Desc
Main Document   Page 11 of 18

The Debtors undoubtedly will argue that they would not take any of these steps or do anything else that would harm creditors, but the Committee members' experience with the Debtors has demonstrated otherwise. Moreover, even absent that prior history, it would not be reasonable for the Committee to simply trust that the Debtors would not take advantage of the provisions of the plan as written. In my experience, the reason the Committee acts is to ensure that the rights of unsecured creditors are fully protected and that those protections are documented—not to simply rely on the good will of a debtor. Chapter 11 debtors also sometimes argue that the unsecured creditors are protected from these loopholes, because the secured creditor will not allow the debtors to take such action. In my experience, it similarly would not be reasonable for the Committee to rely on this for "protection." The reality is that the interests of secured creditors (here Wells Fargo) are not aligned with the unsecured creditors. In addition, the Debtors might pay off Wells Fargo or there might be other reasons that Wells Fargo would allow the Debtors to take action, even if it would harm the interests of unsecured creditors. I have seen numerous occasions when a secured creditor allows a debtor to take actions like these, even where they harm unsecured creditors.

The Committee members also directed us to investigate and advise as to whether any alternatives to the plan existed. In this regard, Mr. Feferman and I could be particularly helpful because of our extensive experience in the industry; we were able to reach out to many contacts that might be interested in purchasing the Debtors' assets, making an investment or pursing another type of transaction. We did reach out to numerous parties. Based on our experience, however, it appeared clear that any interested purchaser was very unlikely to pay enough for unsecured creditors to benefit. Debtors' counsel also made clear to me (and I explained to the Committee members) that any attempt to move forward with a third-party transaction would

LEGAL27209408.2

Case 2:11-bk-27518-GBN    Doc 422    Filed 07/08/13    Entered 07/08/13 14:15:47    Desc
Main Document    Page 12 of 18

require a battle with the Debtors, which would be expensive, time-consuming and far from certain to succeed.

Before the Committee members would agree to a consensual plan, however, they wanted to make sure that the Debtors' operations could be sustained and would be profitable enough to make payments to creditors. Accordingly, the Committee members directed Mr. Feferman to review the operations and finances to make this determination. Mr. Feferman's declaration recounts some of the obstacles created by the Debtors and the difficulties in working with the Debtors. In order to obtain the necessary information, I was called in repeatedly to assist in obtaining documents and information. For most of the time, we were able to avoid burdening the Court with these disputes, which also resulted in savings in legal fees. Ultimately, after Mr. Feferman pointed out numerous problems with the Debtors' projections, the Debtors revised the numbers and provided projections that could be supported. Unfortunately, because of the actions of the Debtors and their refusal to cooperate, this task took an enormous amount of time.

Shortly before confirmation of the plan, we discussed the potential alternatives to the plan with the Committee members. Mr. Feferman and I explained that even if a buyer or investor would be willing to enter into a transaction with the Debtors, it was very unlikely that such a transaction would result in sooner recovery or, even more unlikely, that the recovery would actually be paid to unsecured creditors. Because of our extensive experience in the industry, we were able to identify certain issues with the Debtors' business (and explain them to the Committee) that made it particularly unlikely to allow for a third-party transaction that would benefit unsecured creditors. The Committee members were sufficiently comfortable with our knowledge and expertise to rely on our recommendation. The Committee members then directed

LEGAL27209408.2
Case 2:11-bk-27518-GBN    Doc 422    Filed 07/08/13    Entered 07/08/13 14:15:47    Desc
Main Document    Page 13 of 18

us to negotiate changes to the plan that would result in sooner recovery and the maximum possible protection.

At about the same time, there was a substantial shift in the Debtors' negotiating position. This shift appeared to be the result of Mr. Wheaton's efforts to protect his own individual interests. We discovered that in the period leading up to the bankruptcy filing, the Debtors paid more than $3 million in dividends to shareholders. Mr. Wheaton is the Debtors' largest shareholder and owns almost 50% of the stock, so he received about half of this amount. Based on review of the Debtors' records, it appears that the Debtors already were insolvent at the time that these transfers were made, so if the Debtors' plan was not confirmed, Mr. Wheaton risked having the Committee or a trustee pursue recovery of these transfers. We also found information that appeared to indicate that the Debtors' officers and directors neglected to satisfy their fiduciary duties and instead allowed Mr. Wheaton to engage in several affiliated transactions, thus creating additional potential liability for the officers and directors, including Mr. Wheaton.

I informed Mr. Forrester of these findings and that if an agreement was not reached, we would seek authority to pursue these claims on behalf of the estates. Shortly after these discussions, negotiations towards a consensual plan began to gain momentum. It appeared obvious that the change in course of the negotiations was the result of Mr. Wheaton's desire to avoid the potential litigation that could be commenced against him.

At about the same time, we identified that most, if not all, of the claim filed by the IRS (in the amount of $2,481,149.76) was for payroll related taxes and if these were not paid by the Debtors via the plan, it would result in personal liability at the outset for Messrs. Wheaton and Dowdy.

LEGAL27209408.2

Case 2:11-bk-27518-GBN   Doc 422   Filed 07/08/13   Entered 07/08/13 14:15:47   Desc
Main Document    Page 14 of 18

Over the next few weeks, we worked on these negotiations and reported our progress to the Committee. Ultimately, we explained the changes to the Committee members and explained how the changes would benefit the unsecured creditors, and we recommended that the Committee support the revised plan. Even after we negotiated all of these changes and recommended the plan to the Committee, the Committee members remained very hesitant to agree to the plan. The Committee asked us to analyze and present all other potential alternatives. It was clear that the Committee wanted to pursue another option. We considered the potential risks that would result from pursuing each alternative and, after reviewing the alternatives, again determined that agreeing to the plan (as revised) was superior to all other alternatives. But the Committee members remained very hesitant. In light of the Committee members' prior history with the Debtors, it was very difficult to persuade the Committee members to agree. Mr. Feferman and I, however, believed it was in the best interests of unsecured creditors to go forward, and we were convinced that the best strategy would be to agree to the revised plan and a consensual resolution, without litigation. Mr. Feferman and I went to great lengths to persuade the Committee members that the alternatives were unlikely to provide a better result, that the risks involved in the alternatives were substantial (and outweighed any potential benefits) and that the protections built into the plan would be sufficient to protect unsecured creditors. We strenuously recommended that the Committee members support the plan.

After lengthy discussion, we persuaded the Committee members to agree to consent to the plan and vote in favor of the plan. Before agreeing, however, several of the Committee members made very clear that they were only willing to do so based on our overwhelming recommendation. The Committee members also made clear that they were relying on our advice. Based on my direct involvement in these cases, it is clear to me that without the

- 15 -
LEGAL27209408.2

Case 2:11-bk-27518-GBN    Doc 422    Filed 07/08/13    Entered 07/08/13 14:15:47    Desc
Main Document    Page 15 of 18

strenuous recommendations in favor of the plan, the Committee members never would have consented to the plan and the Debtors would have been required to cram down the unsecured creditors at a contested confirmation hearing.  At a minimum, this would have resulted in substantially higher fees—and might have resulted in the failure of confirmation and perhaps even conversion to chapter 7.

There is no question that the improper actions of the Debtors made this process much more difficult, time-consuming and expensive.  In addition to the events described above and in Mr. Feferman's declaration a good portion of the fees resulted from the Debtors' own failures to comply with their obligations.  The Debtors wholly failed to comply with their obligations to file reports in compliance with Bankruptcy Rule 2013.5.  Similarly, although the Debtors are a public company and required to file reports with the SEC, quarterly, annually and upon the occurrence of a material event, the Debtors failed to file any such reports (with the exception of an occasional Form 8-K, which is similar to a press release and did not contain financial information).  As a result of these failures, we needed to request numerous basic documents and backup information that normally would have been readily available.  Since the Debtors resisted every request we made and ignored many of the requests, obtaining this basic information became a costly task.  This is unfortunate, but these actions were all taken by the Debtors (in an attempt to avoid paying creditors), so the Court should not now listen to the Debtors' complaints about the cost of the Committee's professionals.

I believe that the Debtors artificially created unnecessary obstacles and inefficiencies; and were it not for the bad faith efforts of the Debtors, this would have been a much easier (and cheaper) process.

- 16 -
LEGAL27209408.2
Case 2:11-bk-27518-GBN    Doc 422    Filed 07/08/13    Entered 07/08/13 14:15:47    Desc
Main Document    Page 16 of 18

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed this 8th day of July, 2013, at New York, New York.

>                               */s/ Schuyler G. Carroll*
>                               Schuyler G. Carroll

ORIGINAL electronically filed and
COPY served via email on July 8, 2013, to:


Wesley Ray
**POLSINELLI SHUGART**
One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Email: wray@polsinelli.com
Attorneys for the *Debtors*

Patty Chan
**OFFICE OF THE U.S. TRUSTEE**
230 N First Avenue, Suite 204
Phoenix, AZ 85003
Email:  patty.chan@usdoj.gov


*/s/ Kathryn Hardy*